UNITED STATES v. CHANDLER-DUNBAR WATER POWER CO.

(Circuit Court of Appeals, Sixth Circuit. March 2, 1907.)

No. 1,543.

1. ATTORNEY GENERAL—OUTSIDE COUNSEL—EMPLOYMENT—UNITED STATES—ACTIONS BY.

The question of employing the attorney for a private party to assist in the prosecution of a suit by the United States in the public interest is one addressed to the judgment and discretion of the Attorney General, and such employment should not influence the action of the court if the object of the private party and that of the United States are one and the same.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 5, Attorney General, §§ 2, 5.]

2. PUBLIC LANDS—SUIT FOR CANCELLATION OF PATENT—LIMITATION.

Under Act March 3, 1891, c. 559, 26 Stat. 1093 [U. S. Comp. St. 1901, p. 1521], which provides that "suits by the United States to vacate and annul any patent heretofore issued shall only be brought within five years from the passage of this act," possession by the grantee is not necessary to the running of the limitation; and, while the limitation would not apply to patents for lands which were not public lands subject to disposition by the United States, it will protect a patent for public lands reserved from sale for a temporary purpose which was accomplished long prior to the issuance of the patent, although technically the reservation had not been withdrawn.

3. SAME—VALIDITY OF PATENT—SUFFICIENCY OF SURVEY.

Where the boundaries of a camp ground reserved to Indians by a treaty were fixed by a government survey of the adjoining lands and shown by the plat returned, the tract containing less than 40 acres, such survey was sufficient for the purpose of a subsequent conveyance of the land by the land department after the reservation had been relinquished by the Indians.

**4. SAME—RESERVATION FROM SALE—CONSTRUCTION.**

In creating the Lake Superior land district in 1847, Congress reserved from the lands opened for sale certain lands for school purposes, and also such reservations as the President should deem necessary for public purposes. Pursuant to the authority so given, the President, in order to have time to ascertain what lands were necessary for public purposes, reserved a number of tracts temporarily, one of which, consisting of half a township, included Fort Brady on St. Mary's river, together with the reservation on which it stood, and also a small tract previously reserved to the Indians by treaty for a camp, together with other lands. By a subsequent executive order in 1852 the reservations were more narrowly defined, and all the remaining lands so temporarily reserved, "except the military reservation at Fort Brady," were released from reservation. The Indian right was extinguished by treaty in 1855. *Held*, (1) that neither the reservation in the act of Congress nor in the executive orders had any reference to the Indian reservation, over which the government had no power of disposition; and (2) that the exception in the order of release of the "military reservation at Fort Brady" included only the original reservation as defined prior to 1847, and not the entire temporary reservation of that year, which was the contemporaneous construction of the order by the department, so that in any event the Indian reservation became public lands subject to disposition by the government after the treaty of 1855, and a patent subsequently issued therefor is valid.

**5. NAVIGABLE WATERS—RIPARIAN RIGHTS—TITLE TO ISLANDS IN ST. MARY'S RIVER.**

The United States has no title to islands lying in the St. Mary's river between the Michigan shore and the thread of the stream, which were not surveyed nor claimed at the time of its general survey; but such title, like that to the submerged land, remained in the state, and under the law of Michigan is surrendered to and vests in the owner of the adjoining shore land.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, §§ 253–255.]

Appeal from the Circuit Court of the United States for the Western District of Michigan.

H. M. Hoyt and Duane E. Fox, for appellant.

A. B. Eldredge and Moses Hooper, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. The bill in this cause was filed in behalf of the United States by the district attorney for the Western district of Michigan, under the direction of the Attorney General, for the purpose of removing a cloud upon the title which the United States claims to have in islands numbered 1 and 2, situated in the River St. Mary within the protracted lines of the north half of section 6, in township 47 north, of range 1 east, in the state of Michigan, and about 27 rods north of the south shore of the river. The islands are small, both of them containing not more than 1½ acres of rocks and bowlders projecting a little above the surface of the water. The title which the United States claims to have is one acquired by the cession of the Northwest Territory from the state of Virginia, and from the necessity imposed by the provision of the Constitution delegating to the United States the power to regulate commerce between the states and between the states and foreign countries. The cloud complained of consists in a patent for the land along the shore opposite to the islands granted by

the United States on December 15, 1883, to one Chandler; from whom the defendant claims to derive its title, and the assertion of the defendant that by virtue of the patent, Chandler, and the defendant by mesne conveyances from him, acquired the title to the islands. The pleadings raise these main controversies: First, the complainant contends that the patent to Chandler for the mainland was void because at the date of the patent it was under a reservation which excluded the authority of the land department to sell or convey it; and, second, assuming the patent to be valid, it did not carry the title to the submerged land adjacent and the islands situated therein. The defendant contests both these propositions. At the hearing in the court below upon pleadings and proofs, the bill was dismissed.

In order to understand the grounds on which the decree was rested, and also for the purpose of disposing of an objection raised here by the appellee and based on one of the grounds taken by the court below, it is necessary to make a preliminary statement of some special facts. There is a fall in the St. Mary's river along the front of the Chandler tract of about nine feet, the benefit of which the defendant wished to preserve. The Michigan-Lake Superior Power Company was proposing to divert the water of the river at a point above the Chandler tract, but on the same shore, and carry it behind that tract for the purpose of using it for power. Sharp controversy on this subject was pending between those parties, when on November 26, 1901, one of the attorneys employed by the Michigan-Lake Superior Power Company made application to locate some scrip on these islands and a narrow strip of land along the adjacent margin of the river. This strip would separate the land described in the Chandler patent from the bed of the stream. In March, 1902, the defendant brought suit by bill in equity against the Michigan-Lake Superior Power Company in the state circuit court to restrain the threatened diversion of the water. The defendant in that suit answered admitting the title to the mainland under the Chandler patent, but alleging that the title to the bed of the river was in the state. Shortly thereafter, the Michigan-Lake Superior Power Company employed an attorney at Washington to promote the application of the before-mentioned attorney to locate the islands and the marginal strip by virtue of the scrip as aforesaid. This was in December, 1902. In January following, the Secretary of the Interior requested the Attorney General to bring a proper action to obtain a judicial determination whether unsurveyed islands in the connecting waters of the Great Lakes passed by grants of the riparian tracts. In February following, the Washington attorney of the Michigan-Lake Superior Power Company was employed as special assistant to the United States attorney at a nominal consideration to be thereafter determined by the Attorney General. In April following, a bill was filed by the district attorney in behalf of the United States against the defendant in the court below to settle the question which the Secretary of the Interior had proposed. It assumed the validity of the Chandler patent, but complained that the defendant asserted title thereunder to the islands. This bill was subsequently withdrawn. On September 2, 1903, the present bill was filed, bearing the signature of the United States attorneys and of the special assistant employed in behalf of the United States as before stated. On the fol-

lowing day the Michigan-Lake Superior Power Company moved in the state court for leave to withdraw the admission it had made in its answer of title to the mainland in the complainant (the defendant here) on an affidavit that, from investigations at Washington made by its counsel, it had learned that the complainant (in that suit) had no title therein. The learned judge in the court below, the late Judge Wanty, after referring in his opinion to the presence of the representative of a private party in the promotion of the suit, refused to consider the validity of the Chandler patent, saying:

"The patent to the shore or upland, issued December 15, 1883, to the defendant's grantor, is attacked in the bill for the purpose of defeating any claim of the defendants to these islands; but those allegations will not be considered by the court, as they raise no questions which the United States has any interest in having determined in this suit. If in this case it should be held that the patent to the upland is invalid, then the title to these islands for that reason would be in the United States, and the only question for the determination of which this suit was authorized would be entirely eliminated, as any expression of opinion as to what the status of these islands would have been if the patent had been valid instead of invalid would be obiter dictum. The complainant does not here ask to have this patent set aside, and if it seriously questioned its validity for any reason set up in the bill of complaint its officers would undoubtedly take steps to annul the patent and resume title and possession of the valuable land on the shore as well as to these insignificant islands, whose only value to the complainant, if it does not own the upland, seems to lie in their position to form the subject-matter of a cause for the determination of the question for the adjudication of which this suit was authorized to be instituted in the name of the United States."

Thereupon he passed to the other question, that of the effect of the grant upon the title to the bed of the river, upon which question he held with the defendant. It is contended that the presence of the representative of a private interest to promote a private advantage vitiates the proceeding. We think, however, that the question of the propriety of employing an attorney for a private party to assist in the prosecution of a suit by the United States in the public interest is one addressed to the judgment and discretion of the Attorney General who is charged with the responsibility for the conduct of the suit. If the object of the private party and that of the United States are one and the same, there would seem to be no sound objection. If, however, the name and authority of the United States were likely to be perverted to the promotion of a merely private object, one in which the public has no interest, such facts would indicate the impropriety of such a course, and might in some circumstances rightly influence the judgment in the case. For the reason that in the present case we find no ground for entertaining this objection as a foundation for judicial action in the disposition of the case upon its merits, we overrule it. But of course there will remain to us the duty of considering and determining what results ought to follow from the particular facts exhibited by the record, and from the manner and occasion in which those facts are presented to the court for judgment.

The first question which we shall consider is whether the defendant does not have title to this land by virtue of the statute of limitation of March 3, 1891, c. 559, 26 Stat. 1093 [U. S. Comp. St. 1901, p. 1521], which declares "that suits by the United States to vacate and annul any

patent heretofore issued, shall only be brought within five years from the passage of this act," and the adverse possession held for that period by the defendant after the passage of the act, if indeed possession is necessary to its operation as a limitation.   Counsel for complainant raise two objections to the application of this statute.   One is that this suit is not a suit to annul the Chandler patent, but only to maintain the title to these islands, and that they attack the validity of the patent only for the purpose of maintaining the title to the islands.   This amounts to a contention that although the patent could not be attacked directly, after the time prescribed, yet it may be done indirectly, for the purpose of controlling an incident, the right to which flows from the patent itself.   The proposition is too plainly untenable for argument.   But we add that the general rule is that possession of land under a claim of title for the period prescribed by a statute of limitation vests the title in him for whose protection the statute creates the limitation; and if, as we think, possession is not necessary under this statute, the lapse of time is of itself sufficient to effect the same result.   The right of action of the United States, assuming it to have had any, was complete at the date of the passage of the act, and the lapse of five years without action to annul the grant resulted in the confirmation of it.

The other objection to the application of this statute is that if, as contended, the Chandler patent is absolutely void, the statute cannot apply, "because," quoting from the brief, "in legal effect no such patent ever existed.   Statutes of limitation may protect a voidable title from any question as to its validity, but no statute of limitations can operate upon a thing that never existed."   This statement of statutory limitations is open to criticism.   But it is sufficient now to say that the statute in question is general and contains in itself no exception.   When it speaks of vacating or annulling patents, of course it means the grants of title which the patents purport to make, and which the United States had lawful right to make.   Doubtless this would not extend to lands reserved by treaty, and probably not to lands which had at the date of the statute been taken out of its power of disposition in favor of other parties who had acquired contingent interests therein, though the prospective part of the statute, not quoted above, might perhaps cover such lands if they should fall back into its absolute control.   Having regard to the objects of the statute, we cannot doubt that it was intended to reach and cover, after the lapse of the prescribed period, any such mistake of the land department (assuming it to be such) as the holding that the temporary reservation of the lands in question by the President's order of 1847 was discharged by his releasing order of December 9, 1852.   This temporary reservation by the President and his releasing order are stated and explained in a subsequent part of this opinion, to which we must here make reference.   Such questions are continually occurring in the land department, and it would be intolerable if mistakes in such matters should be visited upon purchasers buying in good faith, and cannot be curable by lapse of time.   It is contrary to the policy of the United States that the validity of its patents should be doubted and distrusted, and that they should for all time continue so. And it was as well for its own interest and credit, as for giving the security due from the government to its purchasers, that the act of

1891 was passed. We can scarcely doubt that it is applicable to the case before us. Counsel for the United States refer us to the language of Mr. Justice Brewer in the opinion of the court in United States v. Winona, etc., Railroad, 165 U. S. 463, wherein, at page 476, 17 Sup. Ct. 368, 371, 41 L. Ed. 789, he says, "Under the benign influence of this statute it would matter not what the mistake or error of the land department was, what the frauds and misrepresentations of the patentee were, the patent would become conclusive as a transfer of the title, providing only that the land was public land of the United States and open to sale and conveyance through the land department;" and reliance is placed upon the proviso that the land be open to sale and conveyance through the land department. And it is claimed that this land was not open to sale, because of the President's reservation under the act of 1847. But we think that this is a narrower construction of the language used than the learned justice intended. This land was, in a larger sense, open to sale by the United States. There had been no absolute reservation of it. There was only a temporary reservation of it which operated only as a temporary suspension of sales by order of the President, for his own convenience, until he should be prepared to make the reservations intended by Congress. And the purpose of the suspension had been accomplished more than 30 years before the issue of the patent to Chandler. Even if the reservation of 1847 had survived the release of 1852 and continued to have its exhausted hold upon all the lands originally reserved, the sale of this land in 1883 would amount to nothing more than a technical error or mistake of the land department, which, if it needed curing, the statute would cure. But as it is possible that we may be mistaken about this, and the principal object of the suit would not be fully accomplished by its disposition upon this ground, we shall consider the merits of the case without regard to the statute of limitations.

We are much impressed by the contention of the appellee that the court below was right in holding, as it did, that upon this bill the question of the validity of the Chandler patent is not a legitimate subject of inquiry. It is not a direct attack. There is no prayer that the patent be declared void. Nevertheless such a decree as is asked in favor of the complainant, if it were rested upon the ground of the invalidity of the patent, would, as we suppose, operate as an estoppel in favor of the United States and of any grantee to whom it might convey. But there are cases in which it has been held that a patent which is utterly void, a patent issued without authority, may be collaterally attacked by any person whose interests are injuriously affected thereby; and such decisions lead us to doubt whether the reasons which we have stated would justify us in declining to pass upon the question of the validity of the patent. We therefore proceed to the solution of it.

The validity of the Chandler patent is questioned upon two grounds: First, because the land was at that time embraced in a reservation for public uses; and, second, because it had never been legally surveyed. On June 16, 1820, while Michigan was yet a territory, the United States entered into a treaty with the Chippewa tribe of Indians whereby, in consideration of the cession by the Indians of 16 square miles of land lying south of the river, and which included the lands now in question,

the United States agreed to secure to them a perpetual right of fishing at the Falls of St. Mary, "and also a place of encampment upon the tract hereby ceded, convenient to the fishing ground." 7 Stat. 206. This "place" was not specified by the treaty. But the locality upon which the Indians had been accustomed to make their encampment was on the south shore of the river at the place where this land is located, and extended back for an indefinite space. The Indians continued to occupy this place for many years with the consent of the government, and a practical location was thus established. The southern boundary remained indefinite for a considerable time, but that and the eastern and western boundaries were at length fixed, by surveys and the assent of the Indians, on lines which included 36.50 acres adjacent to the river, and in which what we here call the "Chandler tract" was included. This reservation, as thus finally located, came to be called and known as the "Indian Reserve." It may be here stated that the right of occupancy by the Indians under the treaty of 1820 was released by them by treaty with the United States on August 2, 1855. 11 Stat. 631. But meantime, on August 26, 1852, Congress, whether with or without the consent of the Indians does not appear, passed an act, 10 Stat. 35, c. 92, granting to the state of Michigan, for the purpose of building a canal, a strip of land 400 feet wide, extending nearly parallel with the general trend of the south shore of the river, across the Indian Reserve, and which, when located, divided it into three distinct parcels, of which the Chandler tract is one. In the act making the "Canal Grant," as it is called, the premises through which the canal was intended to pass was described as "the Military Reservation at the Falls of St. Mary's River," a designation which will be explained later on. The canal grant of the strip through the Indian Reserve was not intended as a substantial invasion of the rights of the Indians. They were already greatly diminished in numbers at that place. As the settlement of that region by the whites progressed, the Indians receded into remoter regions, and, while there were 40 wigwams at the time of the treaty, but 6 remained. Besides, the land was unfit for cultivation. And it was doubtless expected that before the canal would be built the reservation would be extinguished, and this was what happened.

The original survey of that region was made in 1845 by James H. Mullett under the direction of the Surveyor General. In his instructions to the surveyor the Surveyor General stated that in the territory to be surveyed by him there was an Indian reservation at Sault Ste. Marie as a place of encampment and for fishing, which was reported to have been surveyed and "located by the War Department in 1823," as to which he instructed the surveyor as follows: "This reserve you will exclude from the survey, and return a survey of its boundaries to this office." The meaning of this was that he was not to run the customary survey lines through the reserve, but simply survey it out in a lump. This the surveyor did. From this survey of the boundaries the Surveyor General computed the area included therein at 36.50 acres. And the surveyed boundaries and the area of the reservation were entered in the plat. This survey by Mullett having been made by the authority of the government, which directed the survey of the boundaries of the Indian Reserve, and having been approved and made as it was,

the basis of governmental action in dealing with the lands in that locality, is convincing evidence that this reserve had been located and its boundaries established as above stated. And the result was that nothing short of an act of Congress or a treaty could interfere with the right of the Indians to its occupancy. Such action by Congress would have been a breach of faith with the Indians, and its intention to do, or to authorize, any act which would have that consequence, ought only to be inferred from clear and explicit language which could not reasonably be interpreted in any other way. The canal grant when applied to its subject-matter was not susceptible of any other construction than that it was an invasion of the treaty, though in the circumstances, as we think, it was not realized to be more than a technical and practically harmless one. However that may be, it did not affect the reservation to any extent beyond the limits of, or further than, the plain language of the grant required. We postpone for the moment the consideration of the question of the sufficiency of the Mullett survey to justify a sale or other disposition of the land without a further survey.

The settlement at the Sault had increased to the extent that in 1849 it was incorporated as a village under the laws of Michigan. It was laid out in squares, blocks, and lots. Its bounds included the Indian Reserve as well as the reservation at Ft. Brady. Congress, having in mind apparently the desirability of a more accurate and detailed survey of the locality than the original survey, which was, as experience has shown, often inaccurate or defective, passed the act of September 26, 1850, providing for a new survey, which, however, was to be founded on the original survey, with proper corrections and extensions into greater detail. 9 Stat. 471, c. 71. By the seventh section it was directed that the "deputy shall prepare a plat exhibiting in connection with the lines of the public surveys, the exterior lines of the whole village, also the squares, individual lots, and the public lots, and also the outlots, designating the lots reserved for military or other purposes according to the extent and limits of the same, as fixed by the proper military officer, pursuant to the requirements of the second section of this act." This of course included the Indian Reserve, and required that its extent and limits should be exhibited by the plat. But after this act of 1850 was passed the canal grant was located, and the new survey was made subsequently to the location. The surveyor, one Whelpley, when he came to survey the Indian Reserve, found it cut into three parcels by the canal grant, which he naturally assumed excluded the strip within its limits. He therefore surveyed the separated parcels, and exhibited in his plat "the extent and limits" of each. This was manifestly the proper course to pursue. What Congress wanted was a plat which when adopted would exhibit the needful information of the conditions existing at its date. That one of these three parcels which became the subject of the Chandler patent was shown by this survey and plat to contain 9.10¾ acres, and, as already stated, described its bounds. The Whelpley survey was adopted by the department, and has since been acted upon as the final public survey. We may here conclude what we propose to say about the objection that the Chandler patent is void because there then had never been any survey of the land. It is true there has never been any survey of the land upon lines of sections and subdivi-

sions, as when such method of surveying is practicable. There are many instances where the public lands, if sold at all, must be surveyed in a different way from the more common method employed in a wide expense of territory. The object of a survey is as fully attained. If the land was at the time subject to the control and disposition of the department, we cannot think that its disposal upon the existing surveys could be assailed, certainly not in this collateral way.

But it is said that the land was under a reservation which excluded the power of the Land Office to dispose of the land. The reservation for the Indians was extinguished by the treaty of 1855. There was another reservation lying to the east of this which had been reserved for military purposes, on which was located Ft. Brady. This had been gradually reduced to a tract of somewhat less than 40 acres. It had never included the Indian Reserve, and was separated from it by intervening lands. Officers of the War Department had, as the record shows, kept an eye on this part of the Indian Reserve as a place upon which the government might at some time desire to erect fortifications and other erections for defense, and had been in communication with the Treasury and Interior Departments on that subject. But no reservation was made nor could there be so long as the reservation for the Indians continued, without a breach of the treaty. By the act of March 1, 1847, the Lake Superior land district was created, a land office established, and the whole region was opened for sale in like manner as other public lands of the United States are sold. 9 Stat. 146, c. 32. This act contained an exception, in the second section, of sections 16 in each township for the use of schools, "and such reservations as the President should deem necessary for public purposes." On March 31st following, the Commissioner of the Land Office addressed the Secretary of the Treasury suggesting that reservations by the President should be made at a number of specified places on the Sault Ste. Marie and along the south shore of Lake Superior of so much of the lands designated by a list from the fifth auditor as might be found necessary for lighthouse purposes or other public structures until further investigations could be made. This communication was transmitted to the President with the Secretary's recommendation that such reservations be made "until the requisite investigation can be had," as he said. The President on April 3, 1847, ordered that the lands be reserved according to the recommendation. This reservation included a number of tracts in the land district of Lake Superior. The tract at the St. Mary's River included, though not by name, the Indian Reserve, but was more extensive than that, being of the whole north half of the township. This was reduced by executive order made September 2, 1847, but still retained a much larger tract than the Indian Reserve. By subsequent designations it was still further narrowed. But it still contained within its limits the reservation on which Ft. Brady was situated, and also the Indian Reserve. In April, 1852, several prominent citizens of Michigan, among them the Senators from that state, addressed a memorial to the Commissioner of the Land Office representing that it was highly important to the peace and prosperity of the community at Sault Ste. Marie that the locations of the reservations should

152 F.—3

be definitely fixed. It is worth while to copy a paragraph of this memorial as indicating what was then the common understanding of what was considered as the "Military Reservation at Fort Brady":

"If we are correctly informed the line O. D., or westerly line of the military reservation, as marked on the land office survey or map, includes within said reservation a town house and several private buildings long occupied by citizens, and that if the westerly line of the present pickets of' Fort Brady, or a line so far west of said pickets as not to include any private claims or buildings, can be made the westerly line of the military reservation, without prejudice to the interest of the government, it would remove all cause of complaint and be of great advantage to the village in enlarging the now very limited water front and would, in our opinion, give general satisfaction to the citizens of the place."

The line C, D, was the western boundary of the Ft. Brady Reservation. This memorial was transmitted to the Secretary of the Interior by a letter in which the Commissioner stated as follows:

"This office is of the opinion that the time has arrived when the reservations alluded to may be circumscribed within the limits of public utility for Light House, Military, Naval or other public purposes. If such opinion be concurred in by the proper authorities, and in order to facilitate action in the premises, diagrams exhibiting the bodies of land, so reserved, are herewith submitted, and after the Treasury, War, Navy & Interior Departments shall have designated all the permanent sites and circumjacent areas of land needed for Light House, Military, Naval and Indian purposes, the residue may be ordered by the Executive to be brought into market as desired by the memorialists."

Prior to December 9, 1852, Col. Abert of the Topographical Engineers in the War Department, to whom the question of the necessities of that department in the land still reserved was referred, had reported in substance that none of the lands west of the Ft. Brady Reservation were required. And no other reservation at Sault St. Marie was proposed by any other of the departments to which the Commissioner refers. Then, on December 9, 1852, a list of lands at several points on Lake Superior, exhibiting in green the areas therein which had been reserved at those points for lighthouse purposes, was laid before the President, and at the foot he made the following order:

"Let all the lands described in the above list and designated by the green shades on the annexed maps, be reserved for light house purposes; and all the remaining lands situated in the tracts which were temporarily reserved for 'public uses' in the year 1847, (except the military reservation at Fort Brady) be and the same are hereby released from reservation.
"Washington, December 9th, 1852.          "By the President:
                                          "Millard Fillmore."

Thereupon the Commissioner of the Land Office, in directions to the register and the receiver of the district, said: "You will perceive that the President's order releases all the balance of the reservation of 1847, (except the existing reserve for Fort Brady) and you will so note them in your books and plats." And the department has ever since followed that interpretation in disposing of the lands once contained in the reservation of 1847. It is now contended that by the "military reservation at Fort Brady" was intended the reservation of 1847 which was for "public purposes," and which was sometimes called a military reservation, though for no other reason that we can see except that the War Department was the original promoter of it, and because it

was understood to have been made in the anticipation that it might be required for military purposes. The further reservation for such purposes was, as we have seen, abandoned by the War Department when it was consulted upon the question as to what reservations it needed.

Now upon these facts we are of opinion;

First. That Congress did not intend by the act of 1847 that it should have any application to the Indian Reservation. That was already withdrawn from the sale by a treaty which Congress was bound to respect. The subject of its legislation was to reserve land which would otherwise be sold. The reservation made by the President was only precautionary, and covered large areas. It was gradually relinquished and was never made absolute. The exception by the President in his order of December 9, 1852, of the Ft. Brady Reservation was made to prevent the operation upon it of the general release. Nor is there anything whatever in the record to show that the President pretended to have any authority over the lands in the Indian Reservation. See the opinion by Mr. Justice White in Spalding v. Chandler, 160 U. S. 394, 16 Sup. Ct. 360, 40 L. Ed. 469. The general language of the act and of the President's orders thereunder should be interpreted to be limited to the subject to which they could properly apply.

Second. We have no doubt that by "the military reservation at Fort Brady" he intended the Ft. Brady Reservation, and it was suitably described. For, as we have said, he had no authority to deal with the Indian Reservation except to preserve its integrity, and it is to be presumed he did not intend to exceed his authority; further, if he had intended to except two reservations, he would have said so. As the Ft. Brady Reservation had been made for the government's own uses and had not been excluded by treaty with another party, it was prudent for the President, who by the statute was given power to make reservations in a territory which covered the Ft. Brady Reservation and which it was proposed to open for sale, to except it. As we have said, the contemporaneous construction of the President's order was that the only exception made thereby was the Ft. Brady Reservation, and that construction was subsequently followed by those who were charged with the carrying the order into effect. Counsel for appellant, however, point to an exception. This consists of a letter written by the Commissioner of the Land Office, Wilson, to the register and receiver of the district, June 9, 1853, in which, referring to certain lands about which they had written him, included in the first or precautionary reservation, but not in the Indian Reserve, he said:

"These lands are within the reservation for Fort Brady and are, in consequence, not liable to entry, by pre-emption or otherwise. The reservation, as made by order of the President of the United States on the 2nd day of September, 1847, embraces Sects. 4, 5 and 6 of T. 47 N., R. 1 E. & Sect. 1 and 2 of T. 47 N., R. 1 W. and your office was informed, in the letter of the 26th Feby. last of the reservation for Fort Brady, without however designating the tracts."

But in the letter of February 26, 1853, the same Commissioner had, as above stated, informed them that the President's order had released all the balance of the reservation of 1847 except the existing reserve

for Ft. Brady, and directed to so, note them (the lands released) in their tractbooks and plats. It seems probable that the Commissioner, in writing his letter of June 9, 1853, was laboring under the misapprehension that the lands he was writing about lay in the Ft. Brady Reservation. Otherwise there is such a conflict in his statements as to render them without value as evidence of contemporaneous construction.

The Chandler tract was therefore open to the location of the scrip, and had been adequately surveyed. The location of the scrip was permissible, and the patent was and is valid.

We come, then, to the question which is of more general interest to the United States, and the one which constitutes the direct object of the bill, and this is whether the ownership of the mainland carries with it the title to the islands lying between it and the thread of the stream. At this point it seems proper to note an aspect of the case which otherwise it might be thought we had overlooked. It will be seen from what follows that we are of the opinion that the United States has neither the legal or equitable title in the bed of the stream or in these islands, and consequently has not such an interest in the land as is required to support a bill to remove a cloud upon a title. In short, we think the title is in the state of Michigan, if the state has not yielded it to the riparian owner. But this defense, if it be one, has not been raised or discussed by counsel, who have preferred to ignore it. And, as there is a colorable case for the presentation of the merits of the principal question, we have concluded to examine and decide it. But the principles upon which our decision must rest were long since settled, and it seems to us singular that the Department of the Interior requires any fresh judicial declaration of them. The relevant propositions established by the decisions of the Supreme Court of the United States, as we understand them to be, are:

(1) The original states which united under the Constitution owned the land submerged by the navigable waters within their respective boundaries in right of their sovereignty.

(2) This ownership was not surrendered by their union, and remained unaffected thereby except to the extent that they might be affected by the exercise of the power delegated to the United States to regulate commerce between the states and between the states and foreign countries.

(3) Upon the acquisition of territory by the United States, such new territory was held, the terra firma as well as the submerged lands, in trust for the several new states which should thereafter be formed of such territory, subject, however, to the right retained by the United States on parting with it to sell the land for revenue, and this doubtless included lands in islands as well as elsewhere, which the United States should regard as valuable and claim for itself.

(4) This trust was executed by the United States, and the ownership of the submerged lands relinquished when any state thus formed should be admitted into the Union, for upon such admission the new state was entitled to the same rights of sovereignty and be upon an equal footing "in all respects" with the original states. And this was one of the express conditions of the deed of cession executed March 1, 1784, by the

state of Virginia to the United States, of the Northwest Territory, out of which the state of Michigan was formed.

(5) In the case of the state of Michigan, the condition was performed by the act of Congress of June 16, 1836, by which it was admitted with its northern and eastern boundaries on the international boundary, the new state to be "on an equal footing with the original states in all respects whatever." And thereupon the title to the lands submerged by the navigable waters of the state was transferred to the state. But the title to the mainland and of such islands as it should claim was as in other cases expressly reserved to the United States by the act of admission, to be sold for the benefit of all the states.

(6) The title to unsurveyed and unclaimed islands in submerging waters is of the same character with that of the bed of the stream or other navigable waters.

(7) The ownership by the state of lands submerged by navigable waters is in all the states, and equally in them all, subject to such control by the United States as is necessary to the exercise of the power to regulate commerce. To this extent only is the complete title impaired.

(8) The United States has therefore in its several departments, legislative, executive, and judicial, recognized the right of the state in which such submerged lands and unclaimed islands are situated to make such disposition of them as it pleased.

(9) The state of Michigan, as have other states, has relinquished them to the riparian owner.

The leading case of Pollard's Lessee v. Hagan, 3 How. 212, 11 L. Ed. 565, presented nearly all of these questions, and the general principles there discussed and adjudged have ever since been accepted and applied. In that case the plaintiff sought to recover in ejectment lands which had been patented to him by the United States, and which at the date of the patent laid below high-water mark in the Mobile river at the city of Mobile. If the United States had any title, its grantee could recover upon it. And so the case presented the very questions which are presented upon this branch of the case before us. It was held that the plaintiff could not recover, because the United States had no title to convey. The whole subject was fully and ably discussed by Mr. Justice McKinley, in the opinion of the court. The subsequent decisions involving it are too numerous to be separately canvassed. It was examined afresh by Mr. Justice Gray in Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331. The doctrines of the case of Pollard's Lessee v. Hagan were confirmed on all the questions involved in the present case. The only criticism made was of so much of the opinion in the earlier case as implied that Congress had not the power while Alabama was a territory, and had not yet been admitted as a state, to dispose of the land below high-water mark. This was obiter in Pollard's Lessee v. Hagan, for the grant in that case was made after Alabama became a state. As we infer, this criticism was founded upon the theory that, as the United States held the title to the land during the territorial status, Congress had the power to disappoint the expectation by diverting it to another purpose, whatever might be thought of the propriety of its action. But no such question arises here. We pass

by the numerous cases which have followed the cases of Pollard's Lessee v. Hagan, and Shively v. Bowlby, until we come to the recent case of Whitaker v. McBride, 197 U. S. 513, 25 Sup. Ct. 530, 49 L. Ed. 857. A special reason for citing this case exists in the facts that it arose in Nebraska, where the local law in regard to the title to land between high-water mark and the thread of rivers is the same as that of Michigan, and the case involved the title to an island in the river between those lines. In the opinion of the court, delivered by Mr. Justice Brewer, the opinion of Mr. Justice Bradley in Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 35 L. Ed. 428, was cited as authority for the doctrine that "the grants of the government for lands bounded on streams and other waters, without any reservation or restriction in terms, are to be construed, as to their effect, according to the law of the state in which the lands lie." Then, as to the circumstance that the lands in suit were an unsurveyed island of some 20 or more acres, the learned justice pointed out that the omission to include the island in the general survey of that locality was evidence that it was not claimed by the government, and referred to the case of the Grand Rapids & Indiana Railroad Company v. Butler, 159 U. S. 87, 15 Sup. Ct. 991, 40 L. Ed. 85, which was also a case involving an island, for authority, said:

"Upon these surveys (of 1831 and 1837) the adjacent land and the islands (not the island of that suit) were sold and patented to private parties. In 1855 a parcel of ground in the river was, under instructions from the Surveyor General, surveyed and marked 'Island No. 5,' and for that island a patent was issued to the railroad company. We held that the patent to the riparian owner, issued before the date of the last survey, conveyed to him the title to the island."

The case of Grand Rapids & Indiana Railroad Company v. Butler was one in which the question of the title to the fundus or bed of navigable rivers in Michigan was directly involved, as well as that of islands in such rivers which remained derelict, so far as the claims of the United States were concerned, by their omission from the original surveys of the locality. There are numerous decisions of the Supreme Court of the United States in which dependent questions were involved. But there are none which run counter to the general doctrines we have stated. Perhaps the most serious difficulties have been encountered in cases which involved the circumstances, or the extent and manner, of the exercise of the power of Congress to regulate commerce. Of such was the case of Scranton v. Wheeler, which came before this court and again before the Supreme Court. 6 C. C. A. 585, 57 Fed. 80o; Id., 163 U. S. 703, 16 Sup. Ct. 1206, 41 L. Ed. 318.

In Michigan the state has never claimed such islands. Differing in this regard from some of the other states, that state has relinquished them to the adjacent proprietors. In the early case of La Plaisance Bay Harbor Co. v. City of Monroe, Walk. Ch. 155, Chancellor Manning held that the complainant, which had erected wharves, piers, and warehouses on the banks and in the waters of a bay which was a part of Lake Erie, under charter from the state, had no title to the bed of the lake on the front of the land occupied by it. In his opinion he linked in his statement of the rule the bed of the rivers in the state. But

that was obiter.   The complainants were not the owners of any land
on the banks of the River Raisin, the diversion of which river was the
matter complained of.   Whether the decision paid a due regard to the
rights of the complainant as a riparian owner on the bay in the circum-
stances of that case is not now material.   The case was authority for
the contention that the riparian owner on the shore of the Great Lakes
had no title to the bed of the adjacent waters.   But in the case of Lor-
man v. Benson, 8 Mich. 18, 77 Am. Dec. 435, the question was pre-
sented to the Supreme Court of the state in regard to the riparian own-
ers' title to the bed of the Detroit river.   The action was for obstruct-
ing the plaintiff's right to get the ice on the river; and one of the ques-
tions reserved by the trial judge for the opinion of the Supreme Court
was, "Have riparian proprietors on the Detroit river a right of prop-
erty in the soil under the water, or in the ice, or the exclusive right of
taking the same in front of the premises to the middle of the stream?"
The answer of the court is thus stated in the headnote by the reporter,
Cooley, afterwards a distinguished member of the court:  "The com-
mon-law principle that the soil under such tideless public rivers is in
the owner of the adjacent bank prevails in this state, and is applicable
to the Detroit river."   The case in Walker's Chancery Reports was
cited in the briefs, but is not mentioned in the opinion.   The former
chancellor, Manning, had become a member of the Supreme Court and
concurred in the opinion.   This decision has been followed in the later
cases decided by that court.   Rice v. Ruddiman, 10 Mich. 125; Ryan
v. Brown, 18 Mich. 196, 100 Am. Dec. 154; Bay City Gas Light Co. v.
Industrial Works, 28 Mich. 182; Turner v. Holland, 65 Mich. 453, 33
N. W. 283; Grand Rapids v. Powers, 89 Mich. 94, 50 N. W. 661, 14
L. R. A. 498, 28 Am. St. Rep. 276.   And later on the same rule has been
recognized by the Supreme Court of Michigan in People v. Silberwood,
110 Mich. 103, 67 N. W. 1087, 32 L. R. A. 694, in regard to rivers.
But in this later case the court drew a distinction between the land in
the bed of rivers and that in the bed of the Great Lakes, and in regard
to the latter reverted to the rule in La Plaisance Bay Harbor Co. v.
City of Monroe, supra.

In behalf of the complainant it is contended that there is a difference
between the land in the bed of the inland rivers of a state and those on
its boundary, especially where the boundary is an international boun-
dary; but no substantial ground for such a distinction has been sug-
gested, nor can we find any.   The Michigan rule has been applied in-
discriminately to the inland waters of the state and those on its inter-
national border.   Lorman v. Benson and Backus v. Detroit, 49 Mich.
110, 13 N. W. 380, 43 Am. Rep. 447 related to the Detroit river, and
Ryan v. Brown related to the St. Mary's river.

The brief of counsel for the appellant discloses that upon a search
in the early archives of the government it appears that the St. Mary's
river was sometimes, indeed often, called a "strait," and it is likened by
counsel to the Bosphorus and other like great connecting waters.   Much
industry is shown to have been given to this endeavor, and the object is
to show that the St. Mary's river ought to be classed with the Great
Lakes upon the distinction taken by the Supreme Court of Michigan in
People v. Silberwood, 110 Mich. 103, 67 N. W. 1087, 32 L. R. A. 694,

between rivers and lakes. We have preferred to call the stream a river, not only because it seems the more proper appellation, but also because it has in recent times been so called. But it is a small matter to differ about. It is the same stream, by whatever name called, as was the subject of the decision in Ryan v. Brown, and it has a much smaller title to be called a strait than has the Detroit river, which has a much more even current and carries several times the volume of water, and which was the subject of decisions in two, at least, of the Michigan cases.

The complainant says that it needs these islands in order to fulfill its treaty with Great Britain that the Great Lakes and connecting waters should forever remain free and open to the commerce of the contracting parties. But it is not stated that these islands are a menace to the commerce of Great Britain, or that that country has made any complaint or requirement about them. But aside from this, the United States did not, by the treaty, stipulate to make improvements in these waters. It stipulated that it would interpose no obstacle to their navigation in the commerce of the other country. It might have left them all in their natural state without any violation of the treaty. A great number of cases are cited in the brief of appellee from the states where the Michigan rule prevails, and where the river is on the border line between states, and there are a number of cases from such states in the reports of the Supreme Court of the United States where the rule has been applied without regard to the fact that the river was a state boundary.

Again, it is said that the United States needs these islands for its convenience in its commerce on the river. But for what particular purpose of that sort is not stated. No action has been taken by Congress for the construction of any works or the removal of any obstructions at this place which would be affected by the existence of the islands. If the Congress shall at any time require them in order to properly regulate commerce, which in view of their location would seem a rather remote probability, the defendant will not be ousted of its title, but it will become subject to an easement for a public use which may more or less impair its value. But that was a liability to which it was exposed when it acquired the title.

Thus far we have considered this question on its strictly legal aspects. The elements of equity in the attack on the Chandler patent are scant. His application was made May 17, 1881. The Land Office had it under advisement until December 15, 1883, when it granted the patent. It does not appear that the particular objection now made was presented to the Commissioner. But the matter of the reservations in the locality, including the land applied for, must have been under his observation, and the issuance of the patent is at least prima facie evidence that no valid objection to its issuance was deemed to exist. The Land Office then had, and has continued to have in its possession, the same data for raising the question of the validity of the patent that are made the basis for the contention now made. Upon the faith of the grant, the patentee and his grantee have made permanent improvements upon the land costing from $135,000 to $150,000. Following the ancient common-law maxim, "nullum tempus occurrit regi," it has been settled as the rule here that the United States is not affected in respect to its

pursuit of remedies by mere delay or general statutes of limitation. But when it sues in equity as a private suitor on a cause of action relating to its proprietary interests, it is held to be affected by those equities which are recognized as fundamental in controversies between private parties. And why should this not be so? It derogates from the dignity and character of the government to suppose that, formed as it is to secure impartial justice between individuals, it may nevertheless in the conduct of its own affairs, without regard to the principles it represents, perpetrate upon its citizens wrongs which it would promptly condemn if practiced by one of them upon another.

The argument in this case took a very wide range. But we have endeavored to keep as nearly as we could within the limits of the controlling facts in the controversy and the principles which we think applicable to them.

We are of the opinion that the decree of the court below should be affirmed.