### UNITED STATES v. STINSON et al.

(Circuit Court of Appeals, Seventh Circuit. October 6, 1903.)

#### No. 829.

1. UNITED STATES—ACTIONS BY—EQUITABLE ESTOPPEL.

The substantial considerations underlying the doctrine of estoppel apply to government as well as to individuals, and when the United States invokes the powers of a court of equity, whose duty it is to protect the rights of others as well, such considerations should be given weight.

2. PUBLIC LANDS—SUIT FOR CANCELLATION OF PATENTS—SUFFICIENCY OF EVIDENCE.

In a suit by the United States to cancel patents to 14 quarter sections of land issued to the same number of pre-emptors, who had made their final proofs 40 years prior to the commencement of the suit, and thereafter conveyed to defendants, the government claimed that the entries were fraudulent, and that the requisite settlement and improvements had not in fact been made. Six or more of the entrymen were dead, and the testimony of only four of those remaining was taken; two being introduced by plaintiff and two by defendant. Such witnesses, as well as defendant, were old, and, for the most part ignorant, men, and their testimony showed that their memories were uncertain and unreliable as to the transactions in question. It further appeared that defendant had continued to hold the land, which had become valuable, had paid a large amount in taxes thereon, and that he had become insolvent with a large indebtedness, his property being in the hands of a receiver. *Held*, that under such circumstances, and especially in view of the length of time since the patents were issued and the death of so many of the patentees, the government was not entitled to ask the cancellation of such patents, except upon clear and full proof of all the facts entering into the pre-emption transactions, and that the evidence adduced was insufficient.

---

¶ 1. Estoppel against state or United States, see note to State v. Jackson, L. & S. R. Co., 16 C. C. A. 353.

See Estoppel, vol. 19, Cent. Dig. § 152.

Appeal from the Circuit Court of the United States for the Western District of Wisconsin.

The facts are stated in the opinion of the court.

John B. Simmons and M. C. Burch, for the United States.

A. L. Sanborn and Robert Bashford, for appellees.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

GROSSCUP, Circuit Judge. The suit in the Circuit Court was to set aside patents upon fourteen quarter sections of land in Douglas County, State of Wisconsin, issued by the United States severally to fourteen grantees, at different times from December 15th, 1855, to March 25th, 1865. The patents were issued in pursuance of preemption by the several patentees, the dates of settlement named in the affidavits running from August 17th, 1854, to June 11th, 1855, and the dates of proving up running from October 24th, 1854, to June 22nd, 1855. Each of the quarter sections, on or about the date when proven up by the preemptor, was conveyed to appellee, James Stinson; who, following such conveyance, entered into possession, and has continued in possession until February 19th, 1900, when receivers were appointed at the instance of his creditors. In the receivership proceedings debts amounting to upwards of five hundred and eighty thousand dollars have been proven against Stinson, about two hundred and fifty thousand dollars of which are the claims of depositors of a bank operated by Stinson. The lands in suit constitute the main part of the assets available for the payment of these debts—debts presumably incurred, to some extent at least, upon the credit that the apparent ownership of these lands gave to Stinson.

The contention of the government is, that the lands were not preempted in accordance either with the letter or spirit of the preemption law; that there was no actual settlement in person by the preemptor; that no dwellings within the meaning of the preemption law were erected; that the pretended preemptions were in substance the carrying out only, of an arrangement with Stinson, whereby Stinson, under the forms of preemption, obtained title to lands that in no other way could have been purchased by him from the government; in short, that the pretended preemptions were in bad faith, intended at the time, not for the settlement and use of the preemptors, but as a part of Stinson's scheme in land speculation.

Testimony was submitted tending to show the truth of these averments. What conclusion would have been reached had this suit been commenced, and the evidence submitted, within such a period after the preemptions as would have enabled the court to have obtained an adequate knowledge of all the facts, it is not necessary, in the view we take of this case, to state.

The suit was not begun until February, 1895, a period of nearly forty years after the preemptors entered the lands and the government issued its patents. Meantime the land—owing to the fact that the City of Superior, within whose corporate limits the lands are located, has grown with unusual rapidity—have sprung into unusual value. Meantime, also, Stinson has paid taxes amounting to more

than seventy-two thousand dollars, and there are now unpaid taxes, presumably colorable liens in favor of the state and its several municipalities, amounting to nearly as much more. Besides, creditors have come into the transaction—creditors whose only knowledge respecting the lands was that Stinson held the title by patent, and had for forty years been in its undisputed possession and enjoyment. These facts alone would make it incumbent upon the government to present a convincing case—a case that left no considerable doubt that a fraud had been practiced as alleged. But other facts are added.

At least six, and perhaps seven, of the original preemptors have died. Of the seven living, the testimony of three, for some reason, has not been taken. Of the four others, two have been examined upon the part of the government, and two upon the part of the defense. Thus, out of fourteen parties, other than Stinson, to the original transaction, only four have been heard.

The testimony reveals that at least three of these four were originally, and are now, ignorant men, unable readily to understand the questions put to them or to convey their own answers. Of these four, one was, when called as a witness, seventy-seven years old, another seventy-four, and another sixty-five. They speak from a memory displaying uncertainty at every point—a memory on which lapse of time, and advanced years, have contributed to lay infirmity. Nor has Stinson himself escaped these consequences. At the age of seventy-seven he is called upon to ransack his memory for events that happened when he was yet young.

At common law there was no bar by limitation, to the bringing of actions. But this, in time, led to such instances of great injustice, where witnesses to the transaction had died, or papers had been mislaid or destroyed, that to prevent them, and render more certain the tenure of property, statutes of limitation were enacted. Though founded on substantial considerations, the effect of such statutes is to fix, more or less arbitrarily, a time beyond which an action shall not be brought. To the extent that the barrier thus set up fails to adjust itself to the equities of each case, the limitations are artificial.

Laches is the name given in courts of equity to such delay as under all the circumstances of a transaction make the claim sued upon a stale one. Though founded partially upon the same considerations that underlie the statutes of limitations, it is, in its practical application, intended as a spur to speedy inquiry. The doctrine of laches is less artificial, in that it adjusts itself more readily to the circumstances of each case. But, in an important sense, it remains artificial; for one of its chief objects—an object not wholly growing out of the effect of the lapse of time upon the availability of evidence—is to bring causes of dispute to an early adjustment, not because of consideration alone of loss of evidence, but because it is to the interest of society and property that known disputes shall be quickly settled.

These barriers, to the extent that they are thus artificial, cannot be set up against the government. It has not hitherto been supposed —at least no legislative action has been taken on such supposition —that government needed the spur intended, as between individuals, to bring controversies to a speedy close; or that government would

press claims that ought not, by the obliteration of adequate sources of evidence through lapse of time, to be pressed. But when the government seeks its rights at the hands of a court, equity requires that the rights of others as well, should be protected. Carr v. United States, 98 U. S. 438, 25 L. Ed. 209. The government may not in conscience ask a court of equity to set on foot an inquiry that, under the circumstances of the case, would be an unfair or inequitable inquiry. The substantial considerations underlying the doctrine of estoppel apply to government as well as to individuals. Chope v. Detroit Plank Road Company, 37 Mich. 195, 26 Am. Rep. 512; Commonwealth v. Andre, 3 Pick. 224.

A decree such as is invoked in the case under consideration should never be entered unless all the facts entering into the preemption transactions have been gathered with the nicest kind of accuracy. In a case necessarily turning largely upon questions of motive and intention, no data is adequate unless reasonably complete. Courts are disinclined to set aside, upon proof resting wholly in memory, solemn deeds that have not been questioned for such a lapse of years —especially when the parties are dead. Mayor of Hull v. Horner, Cowper Rep. 110; United States v. Flint, 4 Sawy. 58, Fed. Cas. No. 15,121; United States v. Arredondo, 6 Pet. 746, 8 L. Ed. 547; Opinion of Attorney General Black, 9 Op. Atty. Gen. (U. S.) 204.

In the very nature of this case the data brought to our attention is and must remain incomplete. True it is that Stinson is still alive. But the fact of physical death in the cases noted is not a distinction that is controlling. Memory obliterated, or nearly obliterated, is, for the purposes of helpful testimony, as much gone, as the memory of one physically dead. The controlling fact is that the court has no longer a reliable source from which to obtain facts upon which to found a decree. In the very nature of this cause no adequate data can be obtained. Whatever impression the evidence actually submitted may have left, the fact remains—a fact that determines the equities of this suit—that the transactions under review are so remote, and the sources of testimony so depleted by death and time, that there is no longer opportunity to put, with reasonable certainty, one's finger upon the truth. A case thus sapped of any possible satisfactory results from inquiry should not be entertained at all, except for reasons much more cogent than any here disclosed.

The decree of the Circuit Court will be affirmed.