Kinkead, J.
The state bring this action for the recovery of the possession of a small island in Buckeye lake, known as Circle island.
The defendants enter a denial, plead the making of valuable improvements and estoppel.
A jury was waived and the matter submitted to the court.
Although the jurisdiction of the court was raised and determined upon demurrer by another braneh of the court, it is still insisted that the question should be further considered. The contention is that the action being for the recovery of the possession of land, under Section 5019, Revised Statutes, it must be brought in the county where the land is situate.
The question of jurisdiction has been already determined by this court. The practice for many years has been that a decision upon demurrer by one member of the court settles the rule in the particular case so far as this court is concerned.
*327 The terms of Section 210, Revised Statutes, are broad enough to embrace ejectment. Section 210 is a special enactment for a particular purpose, and was enacted before Section 5019, Revised Statutes. Section 5019 is general. •
The rule of statutory construction applicable to the two statutes is that a subsequent statute treating a subject in general terms, and not expressly contradicting the prior act shall not be considered as intended to affect more particularly the positive provisions of the act, unless it be absolutely-necessary to do so, in order to give its words any meaning. Section 5019 does not specifically change Section 210 in so far as it affects the right of the state in bringing any action in Franklin county. We are of the opinion that the demurrer was rightly overruled.
The substantive question to be determined is whether the state has shown that it has legal title to the land in question. The burden rests upon the state to establish such title by a preponderance of evidence. And it must recover upon the strength of its own title rather than upon the weakness of that of the defendants.
The question of fact involved depends upon the boundaries of the reservoir, the stage of water carried in the same from its construction on up to August 10, 1850, when the predecessor of the defendants obtained his patent from the government, and what portion of the 41.80 acres of ground patented by Hodgson, if any, was covered at the time, and for some time thereafter.
State v. Tin & Japan Co., 66 O. S., 182, expressly forbids the establishment of title by “findings, maps, plats, and surveys made by the canal commission.
As between the state and a person found in possession of lands which the state claims as canal lands, the question whether it has ever been appropriated to canal .purposes and owned by the state must be determined by evidence in court where each party can be heard under the rules applicable for the trial and determination of disputed facts. (66 O. S., 211.)
The state in support of its claim in this case has offered in evidence the act of February 4, 1825 (Ohio Laws 23, pp. 50-58), under which the canals were established. Section 8 of this act amounted to an appropriation of all lands, waters and streams taken possession of by the canal commissioners, vesting the fee *328 simple therein, in the state. Some of the land taken for the construction of the reservoir was owned by individuals, which was either paid for in the way of damages in accordance with the provisions of the act, or the owners failed to make claim for damages. The act and the proceedings of the canal commissioners in this regard are competent evidence in this case so far as it goes to show the establishment of the reservoir and the taking possession of the lands for that purpose'. This act, however, could not operate on unpatented United States lands. The land involved in this case is a very small island thirty or forty feet long located approximately 300 feet from the land at a point known as Shell Beach, at the time of the act of February 4, 1825, and during all the period covered by the construction of the reservoir and until August 10, 1850, was United States lands.
William Hodgson obtained a patent for 41.80 acres in the southeast quarter, of the northeast quarter of Section 23, T. 17, R. 18, August 10, 1850. This was located on the south side of the reservoir, and there is no dispute but that a considerable portion of this 41.80 acres was at the time of the patent and ever since has been covered with the water of the reservoir. Although there is no evidence which directly bears upon the point, all the old residents called as witnesses give their recollection of this property as an island; all of them have known the Circle island as an island. The only adverse statement is that at certain seasons of the year the water was so low that a person could walk across a ridge leading from the mainland to the island. All this conclusively shows that for many years (the memory of the witnesses going back as far as 1867, 1860, 1855) the water of the reservoir completely encircled the island.
In support of the claim of the state the act of Congress, 8 Laws .of U. S., pp. 118-120, was introduced. Section 5 of this act granted to the state of Ohio 500,000 acres of lands owned by the United States within the state, to be selected as specified, ‘ ‘ for the purpose of aiding the state of Ohio in the payment of the debt and interest thereon which has heretofore been, or which may hereafter be, contracted by said state in the construction of the canals within.the same, undertaken under the authority of the laws of said state, etc., * * * which land, when selected, shall be disposed of by the Legislature of Ohio, for that purpose and no other.”
*329 Section 6 provides:
‘ ‘ That the selection of the land * * * may be made under the authority, and by the direction of the Governor of the state of Ohio, of any lands belonging to the United States within said state, which may at the time of selection be subject to entry at private sale, and within two years from the approval of this act. * * * That all lands so selected shall, by the Governor of said state be reported to the office of the register of district in which the land lies, and no lands shall be deemed to be so selected, till such report be made, and the lands so selected shall be granted by the United States to the state of Ohio. ’ ’
The act was to take effect upon the Legislature of.Ohio expressing its assent thereto, which was accordingly done in 1829 (27 Ohio Laws, 16).
■ This was a provision to aid the state of Ohio in extending the Miami canal from Dayton to Lake Erie, and the grant of land was to be sold by the state for the purpose of defraying the expense of constructing the canal, and had no relation to any canal but the one named in the act. It is assumed in the brief of plaintiff, and the same assumption has been made in some cases, perhaps, that where the state took possession of unpatented U. S. lands, it was done under the authority of the act of Congress. But the act itself does not justify any such assumption as to this property. It did properly apply to the land involved in the Stoker ease.
It can have no possible application to the present controversy, because if the state did anything in the case, it took possession of so much of the 41.80 acres for reservoir purposes as was covered by water which was afterwards patented to Hodgson, and the state appropriated a great portion of it to its own use when in fact it was still United States lands, and without any express authority.
The report of the canal commissioners to the General As*sembly, Exhibit 8, plaintiff, made January 22, 1832, is a competent item of evidence as tending to show what the state did. This describes the reservoir in general terms, stating that it extended from west to east nearly eight miles; that its medium breadth was about half mile, covering when the surface is six feet above top of water line in the canal, an area of nearly 2,500 acres.
*330 Exhibit No. 11, record No. 1, “award of damages,” is not competent evidence, because there was no occasion for any damages in respect to this land, as the state merely took possession of unpatented lands.
The act of 56 O. L. has no application as there was no occasion under the provis:ons of the act to make claim or award damages.
The report of the canal' commissioners shows that the reservoir was complete in 1833. Whether at that time and continuously up until the date when Hodgson obtained his patent August 10, 1850, the water covered a considerable portion of this land, does not appear by a preponderance of the evidence. A conclusion upon this matter is almost a matter of conjecture. We have upon this point the evidence of Engineer Booten, whose personal knowledge does not run back mariy years. He testifies as to the he:ght of the water-weir since the improvements in the lake, and before, which determines the level of the water, but it does not definitely fix the boundaries of the reservoir on the 41.80 acres of land at the time Hodgson patented it, and for twenty-one years.
I think, however, it is reasonable to suppose that the water did cover much of the 41.80 acres from 1883. But there is no controversy over the inundated portion.
It is claimed that the island was damaged because of its separation from the mainland, and the person owning it would have the right to claim damages, and if no claim was made under the act of 23 O. L., 50, the title in fee passed to the state.
' The answer is that the government owned the land at the time of the construction of the reservoir.
Looking at it in the light most favorable to the state the government conveyed by its patent all that portion of the 41.80 acres which the state had not made it impossible to use, subject to the rights of the state which in time ripened into title. The state or government have never had any occasion to use islands in navigable waters, and they were subject to patent and private conveyance with the land of which they were a part.
We are cited to State v. Stoker, 72 O. S., 638, unreported case.
It is gathered from the briefs in this case that in the Stoker case the lands in controversy were outside the Mercer county reservoir, and that they had’been patented to Stoker in 1849; *331 that they had been used for embankments and as a barrow pit. A quotation in the brief from the opinion of the circuit court discloses that that court was of the opinion that the state took possession of the property of the United States without right to do so, and that no agency of the state “entered upon, 100k possession of or used any of the lands for the prosecution of the improvements intended by the act of February 4, 1825,” etc.
It is urged that in the Stoker case that the state “had never in fact made any specific selections of such lands, but had selected such lands in the same manner as at Licking reservoir, by what we may call a selection in fact, that is, the location of a reservoir including such lands. ’ ’
The Supreme Court reversed the circuit court and quieted the title in a strip of ground lying 150 feet outside the water line. But this was done because the lands had been taken possession of and used for canal purposes. And this land was within the land covered by the act of Congress.
The Licking county circuit court in C., N & Z. Electric Ry. v. Nelson, in which was involved United States lands touching the Licking reservoir which had been taken possession of by the state, considered that the state had a right to appropriate any such lands for canal purposes under the act of Congress.
Longnecker Case, 30 Land Dec., 611, is cited, but the facts are not given sufficient to make an intelligent application. It seems from the quotation that the United States lands had been appropriated by the state, and which became an integral part of the the canal property and were considered appropriated and unpatentable. And it may be that the lands were within the act of Congress.
This tends to show that the government will protect the state as against any irregularities; and this is the position which the courts take whenever the property has been actually appropriated and used for canal purposes.
Section 1 of the act of Congress granted to the state “for the purpose of aiding said state in extending the Miami canal from Dayton to Lake Erie, by the Maumee route, a quantity of land, equal to one-half of five sections in width, on each side of the *332 canal, between Dayton and the Maumee river, at the mouth of the Auglaize, so far as the same shall be located through public land, and reserving each alternate section of the land unsold to the United States, ’ ’ etc. * * *
The said land hereby granted to the state of Ohio to be subject to the disposal of the Legislature of said state, for the purpose aforesaid, and no other.
Section 5 was a grant of 500,000 acres to be sold.
As already stated in the opinion the deduction seems plain that the government was granting particular land for the purpose of sale by the state. The only language used which may be construed as warranting the state in using public lands for construction of-the canal is “so far as the same shall be located through public land.” This evidently contemplated location on public lands over the route described in the first section. But as stated this related to the Miami and Erie canal.
Exhibit No. 11, Record No. 1, “award of damages,” is not competent evidence, and the objection is sustained.
The report of the canal commission shows that the reservoir was complete in 1863. "Whether at that time and continuously up until and at the time Hodgson obtained his patent, August 10, 1850, it covered a considerable portion of this land, does not appear so far as any showing is made by the state.
- I do not see where the evidence of Engineer Booten helps us in view of the rule in State v. Tin & Japan Co., supra. At any rate his knowledge does not go back far enough to clearly show an appropriation, so that we must depend upon the testimony of the old residents.
If the state may claim ownership to the property in question, that is, the island, it is apparent that it must be by an entry, possession and use which must have been of such an open and notorious character as to make it fairly apparent to both the officers of the state and the owners that the lands were taken and used for reservoir purposes. It must prove also that the real estate was used for canal purposes, and that it was “necessary for the prosecution of the improvements intended by this act,” i. e., the act establishing the canal. As stated in Miller v. *333 Wiesenberger, 61 O. S., 561, 585, where the dispute arose under the enactment of Ohio, establishing the canal:
‘ ‘ It should be regarded by the courts at this late day as it was looked upon in the days when the canals were constructed, and to wrest the lands from the owners and to vest a fee thereto in the state, facts should appear from which a court can clearly see that both parties would have known, at the time of the construction of the canals, that the lands in any particular ease had been appropriated and -used for canal purposes. ”
The state claims the island merely because it surrounded the same with water. Even though it did, the surrounding of this real estate by water was incidental to the construction of the reservoir. It can' not be said hardly that' the state had incidental or constructive possession, because it did not take possession of the surrounding land under any claim or color of title, because it was government lands. There is no evidence that the state ever exercised any dominion over the island; and it is clear that it had no occasion to do so until the reservoir was dedicated as a public lake.
The evidence shows that at times between the date of the patent in 1850 to 1905, dominion was exercised over the island by the patentees’ successors at certain times when the water was low enough for cows to pasture, and at other times when it was leased for camping purposes. In 1905 Fisher & Decker sold the island to Charles A. Pence, who sold it to Margaret F. Fenn, describing the ground as an island and part of Lake Tourist property (formerly Shell Beach). From 1860 to 1909, thirty-nine years, the property appeared on the tax duplicate’of Fairfield county as ten acres. This is an indication (though not actual proof) that the remaining portion was covered by water. The failure to have Circle island on the tax duplicate in some definite manner does not affect the question of title.
It may be claimed, with much reason, in a ease like this that where the state has acquired the land covered by water because of its continued use and appropriation, that it can hold and own only that which it has actually taken and used for canal and reservoir purposes; that the patentee was compelled to yield no more than what the state took for the use of the reservoir. ' The *334 state, under the circumstances of this case, having appropriated the submerged land without legal right in the first instance, should not be allowed at this late day to claim ownership of an •island created by its act of appropriation of the surrounding land for the storage of water, which could not be and was not in any way used for the public use to which the surrounding land was put.
The ordinary rules of law which determine the ownership of islands, formed or created naturally in beds of streams or bodies of water, can not be resorted to in solving the problem in this case. The rule is that “the ownership of an island follows the ownership of the bed of the water, so that if the state owns the land under water it belongs to the state. ’ ’ 29 Cyc., 354.
■ But the rules determining ownership to the beds of streams or other bodies of water are determined by the laws of riparian rights or boundaries.
No case can be found precisely like this where the state has taken possession of a small portion of government lands, without specific authority, and by its own acts of use and possession has made an island on the lands patented by the government, for which it had no use until it abandoned the reservoir for canal purposes, and dedicated the same as a public park.
The state is not now asserting claim of ownership to the island because it is necessary to its use for the original design and purpose of the reservoir, but only because it desires to exercise dominion over all space within the bounds of Buckeye lake.
The state can not acquire any rights by adverse possession against the government any more than individuals may against the state. But as indicated in the land decision cited the government will protect the state in its possession of lands for actual use, though irregularly.
The state nas not specifically shown by evidence that water covered the ground surrounding the island at the time of the patent to Hodgson. The memory of Joseph Simpson takes him back fifty years, but there is no testimony showing any part of the 41.80 acres of patented land submerged by water August 1.0, 1850, further than that the reservoir was complete in 1833. But even if it was, it would make no difference because the state *335 never appropriated the island to its use for reservoir purpose. And it never could have prevented Hodgson or his successors from using the same for agricultural purposes. It could not deny the right of ingress or egress to the island, because it took possession of the government land without legal sanction. It would be-reasonable to recognize this right as incident to the legal ownership.
If the state had appropriated this land as it did other privately owned land, the question would be quite different. Islands created upon such lands could well be claimed as state property.
Nothing can be gained by the claim of the navigability of the reservoir, because ownership by the state in streams navigable by nature, or in natural streams or waters, is altogether different from the case under consideration.
Neither can anything be claimed because of the right to a berme bank around the lake if it has any such right, as held by the Licking County Circuit Court.
All the testimony running back as far as the memory of the old residents go, shows that this has always been an island, and title thereto must be determined by its character as such.
It must be held that the state has failed to show that it has used and possessed the island so as to obtain title by adverse possession.
The rule is that the presumed or constructive possession necessary to create title by adverse possession, where the entry is without color of title, extends only to that part of the land actually occupied. Humphries v. Hoffman, 33 O. S., 395.
The state does not claim to have occupied the island. It never asserted any claim until the reservoir was dedicated as a public park, and not until it abandoned its use as a public work. It lays claim after the property has been sold to parties who have placed improvements on it to the extent of $12,000.
The defendants plead estoppel against the state.
In general, it is well understood that the doctrine of equitable estoppel does not apply to the government or state. Estoppels in pais against the state are not favored, and while they may arise from express grants, they can not arise from the laches of its officers. State v. Brewer, 64 Ala., 287.
*336 In U. S. v. Stinson, 125 Fed., 907 ( 60 C. C. A., 615), it is said that the substantial considerations underlying the doctrine of estoppel apply to the government as well as to individuals.
Estoppel was applied in State v. School Dist., etc., 85 Minn., 230.
The state was estopped by its acts in Hough v. Buchanan, 27 Fed., 328 (32 Cyc., 909, n. 77) from claiming lands granted it by the government in aid of railroads, after their selection and grant to the railroad company. See, also, 32 Cyc., 909; Pengra v. Munz, 29 Fed., 830.
This court hesitates to hold that the doctrine of estoppel, should be applied to the state, but there is every reason or consideration why it should be under the circumstances of this case.
The state did not take possession of even the inundated portion of the 41.80 acres under any claim or color of title; it never took possession of or used the island, nor could it have used it; and claim of dominion is not asserted until about ten years after the reservoir is abandoned and the same is dedicated as a public park, and some time after the improvements were made.
No substantial reason is advanced by the state for its dominion. Its officers can perform the duties under the dedication statute whether it has the legal title to the island or not.
In reality, however, there may be no occasion for applying the doctrine of estoppel because the state never had title or possession of the island.
The finding and judgment is in favor of the defendants.