STATE OF IOWA v. CARR et al.

HANNAN v. SAME.

(Circuit Court of Appeals, Eighth Circuit. October 20, 1911.)

Nos. 2,936, 2,937.

*(Syllabus by the Court.)*

1. NAVIGABLE WATERS (§§ 36, 44*)—LANDS UNDER WATER—ACCRETIONS—OWNERSHIP—RULES OF DECISION.

The settled decisions of the courts of a state and its laws which infringe no right secured by the Constitution of the United States, or by the general or commercial law, determine the title to the beds of navigable streams and the extent of the rights of riparian owners to accretions to their lands in that state.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200, 266–278; Dec. Dig. §§ 36, 44.*]

2. NAVIGABLE WATERS (§ 36*)—LANDS UNDER WATER—OWNERSHIP.

It is the law of Iowa, established by uniform decisions of its highest judicial tribunal, that the title of riparian owners upon the shores of navigable streams therein extends to high-water mark only and that the state is the owner of the beds of such streams.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

3. NAVIGABLE WATERS (§ 42*)—RIPARIAN RIGHTS—TITLE TO ISLANDS.

The title to an island which springs up in the bed of a navigable stream vests in the owner of that part of the bed upon which the land forms.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 253–255; Dec. Dig. § 42.*]

4. NAVIGABLE WATERS (§ 44*)—RIPARIAN RIGHTS—ACCRETION AND RELICTION.

The title to land which, by natural and gradual erosion from one bank of a river and gradual and natural accretion to the opposite bank, becomes attached to the latter and rises above high-water mark, vests in the owner of the latter bank, and the title to land which by gradual and natural accretion attaches itself to an island vests in the owner of the island.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 266–278; Dec. Dig. § 44.*]

5. NAVIGABLE WATERS (§ 45*)—RIPARIAN RIGHTS—AVULSION.

But where, by an avulsion, a river suddenly abandons its former channel, and never returns to it, the titles to the islands in, to the bed, and to the banks of the abandoned channel remain fixed where they were at the time of the avulsion.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 279, 280; Dec. Dig. § 45.*]

6. BOUNDARIES (§ 48*)—DETERMINATION—ACQUIESCENCE OF PARTIES.

Where the lands of respective owners adjoin, and for many years one, with the silent acquiescence of the other, has had possession and occupation to a certain line between them claiming title, these facts constitute strong evidence of the correctness of the line, and that line should be taken as the correct line in the absence of persuasive countervailing evidence.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 232–242; Dec. Dig. § 48.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. APPEAL AND ERROR (§ 1009*)—REVIEW—QUESTIONS OF FACT—FINDINGS BY CHANCELLOR.

When a court of equity has considered conflicting evidence and made a finding and decree, it is presumptively right, and unless some obvious error of law has intervened, or some serious mistake of fact has been made, the finding and decree must be permitted to stand.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3972; Dec. Dig. § 1009.*]

8. EQUITY (§ 85*)—LIMITATION OF ACTIONS (§ 11*)—OPERATION AS TO STATE OR NATION.

Neither limitation nor laches founded on mere delay bars a state or the nation from maintaining suits to preserve and enforce its just rights.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 221; Dec. Dig. § 85;* Limitation of Actions, Cent. Dig. §§ 35–39; Dec. Dig. § 11.*]

9. ESTOPPEL (§ 62*)—EQUITABLE ESTOPPEL—ESTOPPEL AGAINST PUBLIC.

In a controversy between the rights of a state or nation and those of a citizen, while the state or nation is not barred by mere delay, its rights are measured and adjudicated by the doctrine of estoppel and the other principles and rules of law and equity applicable to the like rights of a citizen under similar circumstances.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 151–153; Dec. Dig. § 62.*]

10. ESTOPPEL (§ 62*)—EQUITABLE ESTOPPEL—ESTOPPEL AGAINST PUBLIC.

The equitable claims of a state or nation appeal to the conscience of a chancellor with the same, but with no greater or less, force than would those of a private citizen, and, barring the effect of mere delay, they are judicable in a court of chancery, to whose jurisdiction the state or nation voluntarily submits them, by every principle and rule of equity applicable to the rights of private citizens under like circumstances.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 151–153; Dec. Dig. § 62.*]

11. ESTOPPEL (§ 62*)—EQUITABLE ESTOPPEL—ESTOPPEL AGAINST PUBLIC—GROUNDS—TITLE TO LAND.

By an avulsion of the Missouri river whatever foundation there ever was to the claim of the state of Iowa to any land in controversy arose in 1877. It gave no notice of and took no action to enforce any such claim until 1904, when it passed an act to sell abandoned river beds and islands therein to the first applicant, and Hannan immediately applied to buy. The plaintiffs and their grantors had then been in possession of the land in controversy for more than 20 years. During this time the state had levied and collected taxes upon this land as theirs and had acquiesced in their possession, and the plaintiffs and their grantors had paid the taxes and had made costly improvements upon the land.

Held: There was no equity in the claim of the state and it was estopped from maintaining this claim by these facts. "Nothing can call a court of equity into activity but conscience, good faith and reasonable diligence."

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 151–153; Dec. Dig. § 62.*

Estoppel as against State or United States. See note to State of Michigan v. Jackson, L. & S. R. Co., 16 C. C. A. 353.]

Appeal from the Circuit Court of the United States for the Southern District of Iowa.

In Equity. Suit by Samuel Carr and others against Charles R. Hannan and others, and the state of Iowa intervenes. From a de-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cree for complainants, intervener and Jessie W. Hannan, a grantee of defendant Charles R. Hannan, appeal. Affirmed.

Jacob Sims (H. W. Byers, Atty. Gen., on the brief), for appellants.

Edgar H. Scott (Lodowick F. Crofoot, on the brief), for appellees.

Before SANBORN and VAN DEVANTER, Circuit Judges, and POLLOCK, District Judge.

SANBORN, Circuit Judge. The state of Iowa and Jessie W. Hannan, who is the grantee of Charles R. Hannan, one of the original defendants, appeal from a decree of the Circuit Court which quiets the title of the complainants below to the lands which are the subject of this suit, and enjoins the defendants and the state of Iowa, which intervened in the suit, from claiming or asserting any title thereto adverse to that of the complainants and from clouding their title by surveys, reports, or conveyances. The complaint of the appellants here is that the court below failed to find that the land in controversy was an island which sprang up between 1851 and 1867 in the Iowa part of the bed of the Missouri river and accretions thereto, that it also failed to find that this land was a part of the Iowa share of the old bed of the Missouri river which was abandoned during the flood of 1877, and that, on the other hand, the court found that this land consisted of gradual and natural accretions between 1851 and 1877 to the land on the Iowa shore of the river to which the complainants and their immediate and remote grantors had held the title from the United States for many years.

The land here in controversy is a part of the bottom lands round about the Missouri river between Council Bluffs and Omaha. In 1851 that river as it came down from the north turned from its southerly course near Council Bluffs and flowed for a distance of about four miles in a westerly direction across the bottom lands between the higher banks, and then turned again toward the Gulf of Mexico and swept on southerly. In the year 1851 a survey of the land on the easterly or Iowa shore of the river was made, the meander line of that bank was run and fixed by the United States, and upon that survey the patents to the land on the Iowa side of the river were based. In 1856 a survey of the land on the west shore of the river was made by the United States, the meander line of that bank was run and fixed, and the patents to the land on the Nebraska shore were based upon the latter survey. The complainants and their immediate and remote grantors had acquired the title, patented in part by the United States and in part by the state of Iowa under a grant by the United States to that state, of all the lands material to this controversy bordering upon the river upon the east and south as it flowed when these surveys were made. Between 1851 and 1877 the river gradually washed away the sand and soil on the Iowa side and crowded its channel to the south at a point called Busha's Bend on its way across the valley, and at the same time at a point westerly of Busha's Bend it gradually and naturally cut away the soil on the Nebraska side and moved its channel to the north until in 1877 it flowed in the form

of an oxbow from Busha's Bend northerly and then westerly and then southerly around a large tract of land from 500 to 1,000 acres in extent. On July 8, 1877, during a freshet, this river cut across the neck of this oxbow; forever abandoned its old bed in that bow and flowed on to the south. There is within this oxbow a triangular tract of land of several hundred acres in extent which was not disturbed by the wanderings of the channel of this river and to which the state makes no claim. On the northerly and westerly sides of this triangular tract and within the outer line of the oxbow formed by the abandoned channel of the river lies a tract of land several hundred acres in extent which was gradually and naturally made during the years between 1851 and 1877, by the washing away of the soil and sand on the Nebraska shore of the river, and the natural and gradual accretion of sand and soil either to the Iowa shore of the river or to an island that sprang up in the Iowa part of the bed of the stream. The land in controversy is a part of this accreted tract. The complainants and their grantors had been in possession of substantially all of the land in controversy and had been paying taxes upon it to the state of Iowa and to the county in which it is situated for more than 20 years before the state or any of the defendants ever made claim to it. During this time they had spent many tens of thousands of dollars building streets, railroads, and other improvements upon it without any notice from the state or the defendants or any denial by the state or any of the defendants of their title to it. They claim title (1) by their long continuous adverse possession, (2) by the accretion of this land to the lands on the shore of the river to which they hold title from the United States, and (3) by the estoppel of the state from claiming title to this land by reason of the state's long acquiescence in their title and possession by reason of its levy and collection of taxes on this disputed land as the property of the complainants and by reason of the state's failure to give notice of its claim while they were making these expensive improvements and paying their taxes upon it. The state claims title to it (1) on the ground that it is an accretion to an island which arose between 1851 and 1867 on the Iowa part of the bed of the river and lay along the northerly and westerly side of, but separated by navigable water from, the triangular tract whose title is not challenged and (2) on the ground that this land is the Iowa part of the abandoned bed of the river. The defendant Hannan claims the preference right to purchase the title of the state by virtue of a first application to buy it and the payment of a part of the purchase price therefor by her grantor, Charles R. Hannan, in April, 1904, under chapter 185, Session Laws of Iowa for that year. If the state has no equitable title to this land superior to the equitable rights of the complainants, Hannan has none, hence the claims of the state will first be considered.

In Nebraska v. Iowa, 143 U. S. 359, 12 Sup. Ct. 396, 36 L. Ed. 186, the Supreme Court decided that the line between the two states was not changed by the sudden abandonment of the oxbow by the river in 1877, but that it remained the center of the old channel although there was no water in it, and pursuant to that decision the

line between the states of Iowa and Nebraska throughout the oxbow was surveyed and established in that suit. The adjudication of that line in that case, however, is not res adjudicata in the suit in hand because the complainants were not parties to that suit.

[1] The settled decisions of the courts of a state and its laws which infringe no right secured by the Constitution of the United States, or by the general or commercial law, determine the title to the beds of navigable streams and the extent of the rights of riparian owners to accretions to their lands in that state. Barney v. Keokuk, 94 U. S. 324, 338, 339, 24 L. Ed. 224; Hardin v. Jordan, 140 U. S. 371. 380, 11 Sup. Ct. 808, 838, 35 L. Ed. 428; Knight v. U. S. Land Association, 142 U. S. 161, 12 Sup. Ct. 258, 35 L. Ed. 974; Hardin v. Shedd, 190 U. S. 508, 519, 23 Sup. Ct. 685, 47 L. Ed. 1156; Harrison v. Fite, 148 Fed. 781, 783, 78 C. C. A. 447, 449; Hall v. Hobart, 186 Fed. 426, 428, 108 C. C. A. 348.

[2] It is the law of Iowa, established by uniform decisions of its highest judicial tribunal, that the title of riparian owners upon the shores of navigable streams therein extends to high-water mark only and that the state is the owner of the beds of such streams. McManus v. Carmichael, 3 Iowa, 1; Tomlin v. Dubuque R. R. Co., 32 Iowa, 106, 7 Am. Rep. 176; Barney v. Keokuk, 94 U. S. 324, 338, 339, 24 L. Ed. 224; Hardin v. Jordan, 140 U. S. 371, 380, 11 Sup. Ct. 808, 838, 35 L. Ed. 428.

[3] The title to an island which springs up in the bed of a navigable stream vests in the owner of that part of the bed upon which the land forms. Bigelow v. Hoover, 85 Iowa, 161, 52 N. W. 124, 39 Am. St. Rep. 296; Smith v. Miller, 105 Iowa, 688, 70 N. W. 123, 75 N. W. 499; Holman v. Hodges, 112 Iowa, 714, 84 N. W. 950, 58 L. R. A. 673, 84 Am. St. Rep. 367; 1 American & English Encyl. of Law (2d Ed.) 475; 3 Kerr on Real Property, 2294.

[4] The title to land which by natural and gradual erosion from one bank of a river and gradual and natural accretion to the opposite bank becomes attached to the latter and rises above high-water mark, vests in the owner of the latter bank, and the title to land which by gradual and natural accretion attaches itself to an island vests in the owner of the island. New Orleans v. United States, 10 Pet. 662, 717, 9 L. Ed. 573; Jones v. Soulard, 24 How. 41, 16 L. Ed. 604; Banks v. Ogden, 2 Wall. 57, 17 L. Ed. 818; Saulet v. Shepherd, 4 Wall. 502, 18 L. Ed. 442; County of St. Clair v. Lovingston, 23 Wall. 46, 23 L. Ed. 59; Jefferis v. East Omaha Land Co., 134 U. S. 178, 10 Sup. Ct. 518, 33 L. Ed. 872; Nebraska v. Iowa, 143 U. S. 359, 360, 12 Sup. Ct. 396, 36 L. Ed. 186; Missouri v. Nebraska, 196 U. S. 23, 35, 25 Sup. Ct. 155, 49 L. Ed. 372; Washington v. Oregon, 214 U. S. 205, 215, 29 Sup. Ct. 631, 53 L. Ed. 969; McManus v. Carmichael, 3 Iowa, 1; Tomlin v. D. B. & M. R. R. Co., 32 Iowa, 106, 7 Am. Rep. 176; Cooley v. Golden, 117 Mo. 33, 23 S. W. 100, 21 L. R. A. 300.

[5] But where, by an avulsion, a river suddenly abandons its former channel and never returns to it, the titles to the islands in, to the bed, and to the banks of the abandoned channel remain fixed

where they were at the time of the avulsion. Nebraska v. Iowa, 143 U. S. 359, 361, 12 Sup. Ct. 396, 36 L. Ed. 186; Cooley v. Golden, 117 Mo. 33, 23 S. W. 100, 21 L. R. A. 300.

A very large proportion, if not all, of the land in controversy in this suit lay on the north and west of that part of the triangular tract to which the plaintiffs had title from the United States. If an island sprung up in the Iowa part of the bed of the stream between 1851 and 1867 practically all this land was an accretion to that island prior to the avulsion in 1877, and, under the rules of law which have now been stated, the property of the state of Iowa. But if there was no such island this land was an accretion to the Iowa bank, and it was the property of the plaintiffs. The great question in the case therefore was whether or not an island arose on the Iowa part of the bed of the river on the north and west of the triangular tract between 1851 and 1867, and to that issue almost exclusively the evidence, the briefs, and the arguments in the court below and in this court have been addressed.

[11] The evidence upon this issue consists of a great many maps, blueprints and photographs and of more than 700 printed pages of testimony. As usual in cases where the ownership of valuable property depends upon the location and condition of the bed of such a wandering river as the Missouri more than 35 years before the witnesses testified, this evidence is conflicting. No adequate recital of it would be permissible within the reasonable limits of an opinion of this court, and a review of it would be useless because evidence like that before us will probably never be produced in any subsequent case and the decision upon the question of fact it elucidates can never be drawn into precedent. All this evidence, all the briefs and arguments of counsel, have been patiently and deliberately examined by each of the members of this court, and it has reached the same conclusion as did the court below, that there never was an island on the Iowa part of the bed of the Missouri river between 1851 and 1877 on the north or west of the triangular tract and that the land in controversy accreted to the Iowa shore of the river by the gradual and natural deposit by the stream of sand and soil against and upon it prior to the avulsion of 1877. This conclusion disposes of the main issue in this case, the issue to which all the evidence seems to have been directed. and to which counsel for the appellants addressed nearly all their arguments and 162 out of 164 pages of their briefs.

They did, however, assert, and they still insist, that the decree below was erroneous "because by the permanent change in the channel of the Missouri river by avulsion in 1877, as set forth in the pleadings and shown by the evidence, the title to all the land in controversy between high-water mark and the center or thread of the channel, as it existed at the time, vested absolutely in the state of Iowa, and the court erred in not so finding and deciding." Conceding that the title to the land in the abandoned channel between high-water mark on the Iowa side and the middle thread of the river at the time of the avulsion was vested in the state thereby, yet the decree was right unless the proof before the court below was that the land in

controversy was a part of Iowa's share of the abandoned bed. Possession is prima facie evidence of title to real estate. The undisputed testimony that the complainants and their grantors had been in continuous possession of the land in question in this suit for more than 20 years before the state made any claim to it, that during that time the state had levied and they had paid taxes upon it as their land and had made improvements upon it at an expense of many tens of thousands of dollars, was competent, and, in the absence of countervailing evidence, adequate proof of title to the property in the complainants and of the fact that it was not a part of the state's share of the abandoned channel of the river.

[6] Moreover, the arguments and the briefs leave no doubt that a very large proportion, if not all, of the land in controversy is outside of the abandoned river channel, and this fact reduces the issue here to a mere question of the correctness of the boundary lines of the complainants' property, according to which they have held undisputed possession, paid taxes and made costly improvements claiming title with the silent acquiescence of the state for more than 20 years, and brings this portion of the case under the reasonable and salutary rule of evidence that such facts constitute strong proof of the accuracy of the boundary lines, a rule which prevails in the state of Iowa and is stated by its Supreme Court in these words:

"Without any reference to the doctrine of title by adverse possession, the fact that a party owning a tract of land has for many years occupied and claimed up to a particular line as the true boundary, and the owner of the adjoining tract has silently acquiesed therein, is a circumstance strongly tending to show the correctness of the claim: and in the absence of other controlling circumstances the line so indicated should be taken as the true division between the respective premises."

Corey v. City of Fort Dodge, 118 Iowa, 743, 747, 92 N. W. 704, 705 and cases there cited. In view of these facts, of this rule of law and of the evidence of title which the long-continued possession in accordance with these boundary lines produced, the burden was thrown upon the state in the court below to show where, in what respect and to what extent, if at all, these boundary lines were incorrect, and where the true lines were between the plaintiffs' land and the state's part of the abandoned channel of the river. The court below considered all the evidence in the case upon this subject, found that the state had not successfully borne this burden, that the boundary lines in accordance with which the plaintiffs and their grantors had occupied and improved were the true boundary lines of their property and confirmed their title in accordance therewith.

[7] This is a suit in equity. And when a court of equity has considered conflicting evidence, and made a finding and decree, it is presumptively correct, and, unless some obvious error of law has intervened or some serious mistake of fact has been made, the finding or decree must be permitted to stand. Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Furrer v. Ferris, 145 U. S. 132, 134, 12 Sup. Ct. 821. 36 L. Ed. 649; Warren v. Burt, 7 C. C. A. 105, 110, 58 Fed. 101, 106; Paxson v. Brown, 10 C. C. A. 135, 144, 61

Fed. 874, 879; Stuart v. Hayden, 18 C. C. A. 618, 623, 72 Fed. 402, 407; Fitchett v. Blows, 20 C. C. A. 286, 290, 74 Fed. 47, 51; Coder v. Arts, 82 C. C. A. 91, 94, 152 Fed. 943, 946, 15 L. R. A. (N. S.) 372. The burden in this court is therefore upon the state to show from the record of the evidence that the court below made a serious mistake in its finding of this issue of fact. To bear this burden it presses upon our attention a certain blueprint marked "Exhibit No. 9," the testimony of the surveyor who made it and Allen's Suburban map. Exhibit No. 9 has a line upon it which fixes, with reference to the government surveys, the boundary line throughout the oxbow between Iowa and Nebraska which was established by the decree in Nebraska v. Iowa, 143 U. S. 359, 12 Sup. Ct. 396, 36 L. Ed. 186. There are also upon this exhibit numerous lines upon each side of this boundary line drawn to portray Cut-Off Lake as it existed in 1904 when the surveyor made this map, but these lines are not fixed with reference to the lines of the government surveys, nor do they purport to represent the river or its high or low water mark in or prior to the year 1877. Moreover, Cut-Off Lake is not identical in extent with the river as it flowed around the oxbow in that year. It occupies but a part of the abandoned channel and the record does not show what part. A comparison of the boundary lines of the land in controversy which was possessed and occupied by the plaintiffs with the description of the boundary line between the states upon this Exhibit 9 discloses the fact that in some cases the boundary lines of the land in controversy coincide for different distances with this boundary line between the states, and if there was any substantial evidence where the high-water mark of the river as it flowed through the oxbow was in 1877, and that the boundary line between the states marked on this exhibit was the middle line of the stream at that time, there might be some data here from which the deduction could be justly drawn that the plaintiffs' boundary lines were incorrect and that they included some part of the Iowa part of the abandoned bed. But the surveyor who made Exhibit No. 9 testified that he made the plat and the survey for it in the year 1904, that Cut-Off Lake was in a part of the old river bed, but he nowhere indicated what part of that bed it occupied, that he did not find or locate the river or its bed in 1877, except as it was shown by this lake in 1904, that he never located the river, that he was one of the surveyors selected to locate the state boundary line in the case of Nebraska v. Iowa, that in doing so they did not look up or determine where the center line of the river had been when it ran through the oxbow, but they ran the boundary line between the states from data furnished to them from records in the courthouse in Pottawattamie county, and this line thus run was the boundary he drew and described in his blueprint Exhibit No. 9. Allen's Suburban map bears the date 1898. Neither that map nor the testimony of any witness concerning it tends to show more definitely than the evidence which has been already recited where the middle thread of the river as it flowed through the oxbow was at or prior to the avulsion in 1877. Neither of these exhibits shows, or purports to show, where the high-water mark of the river was on its

Iowa side in 1877 at or prior to the avulsion, and the entire record of this case has been searched in vain for any evidence that locates it. In this state of the case there is no escape from the conclusion that the state's evidence falls far short of showing that the court below made any mistake of fact, when, in view of the plaintiffs' possession for more than 20 years, and hence their presumptive title to the land in controversy, in accordance with the boundary lines they claimed, of the state's silence and acquiescence therein, of its levy and the plaintiffs' payment of taxes on the land as their own and of their costly improvement thereof during this time, it concluded that there was no evidence in this case sufficient to prove that their boundary lines were incorrect and confirmed their title.

The equity and righteousness of the result to which this study and analysis of the evidence upon the direct issues in this case leads is demonstrated by other considerations which the record forces upon our attention. The avulsion that vested in the state every claim it ever had to any land in or about the oxbow occurred about July 8, 1877. More than 26 years passed before the state took any action that indicated any intention to claim any interest therein. Meanwhile the lands in controversy were, for more than 20 years, in possession of the plaintiffs and their grantors. They built streets, railways, buildings, and other improvements upon them. The state taxed and treated them as the property of the plaintiffs. Without notice or warning on the 13th day of April, 1904, the Legislature of Iowa enacted chapter 185 of the Session Laws of that year to the effect that all land between high-water mark and the center of the abandoned channel of any navigable stream, and all bars, islands, and land within such channels, should be sold to the person who should make written application therefor, should deposit 50 cents per acre, and should pay the balance of the value thereof after a survey of the land and a report of appraisers. On April 14, 1904, Charles R. Hannan made his written application to purchase of the state all the land within the outer lines of the oxbow and deposited $1,000 in part payment of the purchase price of the tract. The state appointed L. P. Judson to survey this land, and thereafter in October, 1904, the complainants exhibited their bill in this suit against Hannan, Judson, and W. B. Martin, the Secretary of the State of Iowa, to enjoin them from clouding the complainants' title to the lands in controversy by further proceedings under chapter 185. The state of Iowa was not a party to this suit and no attempt was ever made by the complainants to make it a party. On March 2, 1907, upon the application of the Attorney General of the state, the court permitted it to intervene, and thereupon it voluntarily filed its petition of intervention in which it alleged that it was the owner of the land here in controversy by virtue of its ownership of the alleged island and of its part of the abandoned river bed. It was then almost 30 years after its claim to any of this land first arose, and if it had been a private party its silence, acquiescence, and laches would undoubtedly have estopped it from asserting any claim to this land against these plaintiffs. Counsel for the appellants, however, invoke the general rule that neither by the statute of

limitations, nor by laches, does mere delay bar the sovereignty from maintaining its rights or from sustaining a suit to enforce them. United States v. Insley, 130 U. S. 263, 266, 9 Sup. Ct. 485, 32 L. Ed. 968; United States v. Beebe, 127 U. S. 338, 344, 8 Sup. Ct. 1083, 32 L. Ed. 121; United States v. Winona & St. P. R. R. Co., 67 Fed. 969, 971, 15 C. C. A. 117, 119; United States v. Dalles Military Road Co., 140 U. S. 599, 632, 11 Sup. Ct. 988, 35 L. Ed. 560; City of Pella v. Scholte, 24 Iowa, 283, 95 Am. Dec. 729; Davies v. Huebner, 45 Iowa, 574, 577; Manatt v. Starr, 72 Iowa, 677, 34 N. W. 784. They also contend that every sovereignty is exempted from the rule of equitable estoppel.

[8, 9] But the great weight of authority, the stronger reasons and the settled rule upon this subject in the courts of the United States, is that, while mere delay does not, either by limitation or laches, of itself constitute a bar to suits and claims of a state or of the United States, yet, when a sovereignty submits itself to the jurisdiction of a court of equity and prays its aid, its claims and rights are judicable by every other principle and rule of equity applicable to the claims and rights of private parties under similar circumstances.

[10] The equitable claims of a state or of the United States appeal to the conscience of a chancellor with the same, but with no greater or less force than would those of an individual under like circumstances. United States v. Stinson, 197 U. S. 200, 204, 205, 25 Sup. Ct. 426, 49 L. Ed. 724; United States v. Detroit Timber & Lumber Co., 67 C. C. A. 1, 10, 131 Fed. 668, 677; United States v. Chicago, M. & St. P. Ry. Co. (C. C.) 172 Fed. 271, 276; United States v. Chandler-Dunbar Water Power Co., 152 Fed. 25, 26, 27, 37, 38, 40, 41, 81 C. C. A. 221, 222, 223, 233, 234, 236, 237; United States v. Stinson, 125 Fed. 907, 910, 60 C. C. A. 615, 616; Herman on Estoppel, §§ 676, 677; State of Michigan v. Jackson, L. & S. R. Co., 16 C. C. A. 345, 351, 69 Fed. 116, 122; State v. Flint & P. M. R. Co., 89 Mich. 481, 51 N. W. 103, 106; United States v. California & Oregon Land Co., 148 U. S. 31, 41, 13 Sup. Ct. 458, 37 L. Ed. 354; Carr v. United States, 98 U. S. 433, 438, 25 L. Ed. 209; United States v. Walker (C. C.) 139 Fed. 409, 411, 412, 413; United States v. Willamette Valley & C. M. Wagon Road Co. (C. C.) 55 Fed. 711, 717; Attorney General v. Central Railway Co., 68 N. J. Eq. 198, 59 Atl. 348. Thus a state is estopped from ousting a city organized under a void law after the city has been exercising its assumed powers for only four years, but has levied and collected taxes and assessments, constructed bridges and streets, and made other improvements meanwhile without protest or objection on the part of the state. State v. City of Des Moines, 96 Iowa, 521, 532, 533, 65 N. W. 818, 31 L. R. A. 186, 59 Am. St. Rep. 381. And a state is estopped from ousting a private corporation for illegality in its organization after a delay of a few years while the corporation has been exercising, without objection on the part of the state, its assumed corporate powers, has been collecting and expending money and changing its financial relations to its stockholders and creditors in reliance upon the acquiescence of the state. Commonwealth v. Bala & Bryn Mawr Turnpike

Co., 153 Pa. 47, 25 Atl. 1105; State of Wisconsin v. Janesville Water Power Co., 92 Wis. 496, 66 N. W. 512, 515, 32 L. R. A. 391; State v. Lincoln Street Ry. Co., 80 Neb. 333, 114 N. W. 422, 427, 14 L. R. A. (N. S.) 336; State v. School District No. 108, 85 Minn. 230, 88 N. W. 751; Attorney General v. Delaware & Bound Brook R. R. Co., 27 N. J. Eq. 1, 24; People v. Alturas County, 6 Idaho, 418, 55 Pac. 1067, 1068, 44 L. R. A. 122; Vermont v. Society for the Propagation of the Gospel, 2 Paine (C. C.) 545, Fed. Cas. No. 16,920. According to the decisions of the highest judicial tribunal of the state of Iowa a city may be estopped from claiming a street or an alley, or from maintaining the original lines thereof, by acquiescing in the possession, occupation and improvement of it, or of a part of it, by a citizen who claims title thereto by possession and estoppel only. Corey v. City of Fort Dodge, 118 Iowa, 742, 749, 92 N. W. 704. The same court holds that a like estoppel may arise against a city by its taxation of the property when the claimant in possession pays the taxes. Smith v. City of Osage, 80 Iowa, 84, 89, 45 N. W. 404, 8 L. R. A. 633; Dillon on Corporations, § 533; Audubon County v. Emigrant Co., 40 Iowa, 460; Page County v. B. & M. R. R. Co., 40 Iowa, 520; Austin v. Bremer County, 44 Iowa, 155; Adams County v. B. & M. R. R. Co., 39 Iowa, 507.

Notwithstanding these authorities the state insists that the plaintiffs may not maintain an estoppel here because the title to the land in controversy is the same as that of a certain tract of 13 acres which the East Omaha Land Company, a predecessor in interest of the complainants, claimed as an accretion to a government lot owned by it in a suit between that company and one Hansen and others which was commenced in the year 1890 and in which the ultimate decision was that this 13 acres was not such an accretion, but was an island which arose in the Iowa part of the bed of the Missouri river, and hence was not the property of the Land Company. But the claim of estoppel here is based on the tacit acquiescence of the state in the possession and claim of the plaintiffs and their grantors and on its taxation of this property as theirs. The suit and decree in Land Company v. Hansen and others was no notice that the state had not waived, and was not by its acquiescence and taxation waiving, all claim to the lands is controversy in this suit (1) because the state was not a party to that litigation, made no claim and gave no notice of any demand therein; (2) because the 13 acres involved in that suit is not any part of the subject-matter of this suit; and (3) because the evidence in this case is that there never was any island where the 13 acres are located and notice of the claim in that suit that there was such an island would have been, as the evidence now proves, notice of a baseless claim and for that reason futile.

Counsel invoke the conceded rule that there may be no estoppel of a party from asserting his titles and rights where knowledge, or the means of knowledge of them, is equally open to both parties There are, however, two reasons why this rule is not controlling in the case in hand. In the first place the rule has an exception that the owner of a known right or title may by his representations, acts or silence

so lead another to act in the belief that the owner has waived, surrendered or abandoned his right or title that he will be estopped from asserting it to the injury of him who has changed his position in reliance upon the owner's representations, acts or silence. In the second place no one had or could have had either knowledge, or means of knowledge, of the right of the state, if any, in the lands in controversy here before the final decrees of the courts upon them are rendered. Its right always depended upon the proof which would be adduced in any controlling litigation which might arise over it, first, of the location of the middle thread of the Missouri river and its high-water mark on its Iowa side through the oxbow in 1877 prior to the avulsion, and, second, of the existence and location of one or more islands between 1851 and 1867 between the thread of the stream and the high-water mark of that river at the time the island or islands sprang up. No man could learn, foresee or foretell what the memories of witnesses that might be found and their testimony would be regarding the existence and location of such islands and lines, years before they were called to testify, in a river changing its bed and channel so constantly and notoriously as the Missouri. This condition of the river and the property and these facts render the doctrine of equitable estoppel peculiarly applicable and salutary in the case at bar. The authorities which have been already cited amply illustrate and sustain these views. United States v. Chandler-Dunbar Water Power Co., 152 Fed. 25, 26, 27, 37, 38, 40, 41, 81 C. C. A. 221, 222, 223, 233, 234, 236, 237, is very persuasive. There were islands in the Detroit river which were the property of the United States if duly surveyed and claimed by it. The United States neglected to survey and claim them, and in 1883 it issued a patent to the bank of the river which, in the absence of the title and claim of the United States, would convey to the patentee as riparian owner the bed of the stream on which the islands stood and hence the islands themselves. Knowledge of the right of the United States was always equally open to all the parties in interest. The patentee and his grantee had made improvements upon the land at an expense of $135,000 to $150,000 on the faith of the patent and the neglect of the government to survey and claim the islands. On September 2, 1903, the government brought a suit in equity to remove the cloud of the patent from its title to the islands. Judge Severens, delivering the opinion of the Circuit Court of Appeals for the Sixth Circuit, said:

"Following the ancient common-law maxim 'nullum tempus occurrit regi,' it has been settled as the rule here that the United States is not affected in respect to its pursuit of remedies by mere delay or general statutes of limitation. But when it sues in equity as a private suitor on a cause of action relating to its proprietary interests, it is held to be affected by those equities which are recognized as fundamental in controversies between private parties. And why should this not be so? It derogates from the dignity and character of the government to suppose that, formed as it is to secure impartial justice between individuals, it may nevertheless in the conduct of its own affairs, without regard to the principles it represents, perpetrate upon its citizens wrongs which it would promptly condemn if practiced by one of them upon another."

In State of Michigan v. Jackson, L. & S. R. Co., 16 C. C. A. 345, 346, 350, 351, 352, 69 Fed. 116, 117, 121, 122, 123, 50,000 acres of land were granted to the state as swamp lands by the act of Congress of September 28, 1850. But these lands were subsequently certified, and finally between 1869 and 1873 erroneously patented to a railroad company in supposed execution of a grant of the United States by the act of June 3, 1856, to the state to aid in the construction of railroads. Knowledge of the title of the state to these lands was, by the acts of Congress and the public records, equally open to all parties in interest. A railroad company to whom the lands were conveyed by the patentee built the railroad in reliance upon the title evidenced by the patents, sold a part and still held a part of the land when in 1887 the state of Michigan brought a suit in equity to remove the cloud of these patents and of the conveyances under them from its title to the land under the swamp land grant. The Court of Appeals of the Sixth Circuit dismissed the bill and said:

"The state cannot be permitted to say that it has slept during all this long period and abandoned its sovereign duties to its citizens, as well as its reciprocal moral obligations to the government which had made it so magnificent a gift. The state is not to be regarded as a mere machine, incapable of intelligence or conscience. And, while it is necessary and right to restrain or annul the unauthorized acts of its agents by which its interests might be impaired, yet there must come a time after long-continued acquiescence in public action with knowledge of it, when, in the interest of its citizens, the state itself shall be precluded from despoiling others by the assertion of its original rights."

To the same effect on a similar state of facts was the decision of the Supreme Court of Michigan in State v. Flint & P. M. R. Co., 89 Mich. 481, 51 N. W. 103, 106.

In United States v. Walker (C. C.) 139 Fed. 409, 412, 413, 420, Walker was a United States marshal from 1889 to 1893. During this time he presented in his accounts charges for services rendered by his deputies which he and the accounting officers supposed to be lawful, but which were in fact illegal. The United States allowed and paid these charges from time to time during the four years he held his office, knowing that a large portion or all the amounts so paid to him would be immediately paid over by him to his deputies in payment of their services, as it was. Five years after his accounts had been allowed and closed and after the expiration of his term as marshal, the United States presented to the Circuit Court a claim for the repayment of these amounts by Walker, but the court refused to sustain the claim and said:

"When the sovereign comes into court to assert a pecuniary demand against the citizen, the court has authority, and is under duty, to withhold relief to the sovereign, except upon terms which do justice to the citizen or subject, as determined by the jurisdiction of the forum in like subject-matter between man and man."

The state comes into this court of equity and prays its decree that the title to the land in controversy be quieted in it. Its claim originated in 1877. It never asserted or suggested it until more than 26 years thereafter, and one cannot wink so hard as not to see that it

never would have asserted it if the hope of gain had not inspired Hannan, or some other speculator, to instigate and promote the demand. For more than 20 years the plaintiffs and their grantors were in undisturbed possession of this land, claiming title to it. Meanwhile they expended tens of thousands of dollars in its improvement, and the state quietly acquiesced in their possession and claim, and levied and collected from them taxes upon it as their property, and now by its silence, acquiescence, and taxation it is equitably estopped from taking from these plaintiffs this land and the costly improvements they and their grantors were thereby induced to make upon them.

In Smith v. Clay, 3 Brown, Ch. 639, Lord Camden said:

"Nothing can call forth this court into activity but conscience, good faith and reasonable diligence."

There is no equity in the claim of the state against the plaintiffs in this case, it does not appeal to the conscience, it is met by an equitable estoppel, it was not presented or prosecuted with reasonable diligence, and a court of equity may not sustain it.

Questions which have not been discussed in this case were presented by the briefs and arguments of counsel but the conclusions which have been reached render them immaterial.

And because the evidence in this case fails to convince that the court below fell into any error of law, or made any mistake of fact in its finding that the proof failed to establish that the land in controversy, or any part of it, was ever an island in the Missouri river or accretions to such an island, or a part of the abandoned channel of the river between the thread of the stream and high-water mark on the Iowa side in 1877, prior to the avulsion, and because by the continued adverse possession of this land by the plaintiffs and their grantors, claiming title for more than 20 years before the state made any claim to it, by the acquiescence of the state in their possession and claim and its levy and collection from them of taxes upon it as their property during this time and by the expensive improvements they made upon it in reliance upon this acquiescence and taxation, the state is now estopped from asserting title to this property in equity, the decrees must be affirmed and it is so ordered.